THE STATE v. UMFRIED, *Appellant.*

1.  **Evidence**: RES GESTAE. On a trial for homicide, the defendant offered to show by a witness that a day or two before the homicide the witness had heard defendant say that his son had told him that deceased was angry with him (defendant), and had threatened to mash his brains out, and that defendant requested witness to see deceased and explain the matter and assure deceased that defend-

ant did not want any trouble with him; `Held,` that the evidence constituted no part of the res gestae, and was properly excluded.

2. **Instructions.** An instruction is not erroneous simply because it omits to tell the jury that they must base their finding and belief on the evidence.

3. **Self-Defense:** APPARENT DANGER. The acting on a reasonable belief of harm, though unfounded, excuses 'the defendant. But this principle has no application, and instructions embodying it should not be given, in a case where the hostile demonstration which induced the act was made with a real and not an apparent deadly missile or weapon, the exact nature of which the defendant could see.

4. **The facts** in this case held to justify a verdict of manslaughter in the fourth degree.

*Appeal from Benton Circuit Court.*—HON. JAMES B. GANTT, Judge.

AFFIRMED.

*W. S. Shirk* and *James H. Lay* for appellant.

*D. H. McIntyre,* Attorney General, for the State.

NORTON, J.—Defendant was indicted in the Benton county circuit court at its October term, 1881, for murder in the second degree in killing Walter Bartlett. At the May term, 1882, of said court, he was put upon trial and convicted of manslaughter in the fourth degree, and his punishment assessed at two years' imprisonment in the penitentiary. The case is before us on defendant's appeal, and the ground relied upon for a reversal of the judgment, is the action of the court in refusing to admit evidence, and in giving and refusing instructions.

The evidence preserved in the record tends to show the following facts: that deceased, the morning he was killed, went to the store of defendant where the post-office was kept, called for his mail and was. proceeding to leave when he was accosted by defendant in a friendly manner, who then said to Bartlett, "I understand that you accuse

me that I have worked against your wind-mill;" Bartlett replied "that he had;" defendant said " you are mistaken and I can prove it;" whereupon deceased said " the wind-mill you bought you paid more, or $5 more for, and I can prove it by Charlie Davis;" thereupon defendant sent for Davis, and when Davis came Bartlett asked him if he (Davis) had not told him that the wind-mill cost a certain sum, naming it, to which Davis replied that he did not remember, but could tell him in a few minutes; that at the time Davis came into the store defendant was sitting on the north counter, and Bartlett was standing near the counter on the opposite side, about eight feet from defendant, the space between the two counters being ten or eleven feet; that the controversy between deceased and defendant continued, and deceased called defendant " a d—d lying son of a. b—h," to which defendant replied, according to the evidence of one witness, " that is not so," and according to another, " that is a lie;" whereupon deceased repeated what he had said, picked up a split-bottomed chair, drew it back, advanced a step or two toward defendant, who jumped off the counter, and passing in six feet of Bartlett went into the post-office which was kept in the same building, and deceased stepped back a step or two, set the chair down to his left, holding it in his hands. Umfried came back from the room in which the post-office was, stepped behind the counter on which was a show-case, the top of which was from four to four and a half feet from the floor ; that when defendant returned from the post-office he had an eight inch Colt's navy pistol in his right hand cocked and presented over the show-case, according to one witness in the direction of deceased, and according to another pointed at the deceased ; that defendant ordered deceased, who was talking boisterously, twice, to leave his store; that witness, Davis, who observed defendant with his pistol, said "Hold on Umfried," and at that time Bartlett struck around with the chair left-handed over the show-case which knocked the pistol to one side, when it imme-

diately came back and was fired, shooting deceased in the forehead near one eye, killing him instantly.

Evidence was also introduced of threats made a short time previous by deceased against defendant, those made the day before the tragedy having been communicated to defendant.

During the examination of witness Brill, he was asked to state whether or not, a day or two before Bartlett was

1. EVIDENCE: res gestae.

shot, he heard defendant say that his son had told him that Bartlett was angry with him and had threatened to mash his brains out, and whether or not defendant requested him to see Bartlett and explain to him that he had not worked against his wind-mill, and that he did not want any trouble with him. The refusal of the court to allow this question to be answered, it is insisted is error.

The statements sought to be proven were not a part of the res gestae, and being the statements of defendant offered in his own favor, were inadmissible under the rule laid down in the case of the State v. Evans, 65 Mo. 574.

The court, of its own motion, gave eleven instructions, the second of which is as follows: "Manslaughter is the intentional killing of a human being in a heat of passion, on a reasonable provocation, without malice and without premeditation, as these terms are hereinbefore explained, and under circumstances that will not be justifiable or excusable homicide; and if the jury find and believe that the defendant, in a sudden, passion, on a reasonable provocation, intentionally shot and killed the deceased, without malice or premeditation, and not in the necessary defense of his person, then the jury should find him guilty of manslaughter in the fourth degree and assess his punishment," etc.

It is insisted that the evidence did not tend to show a case of manslaughter in the fourth degree, and that, therefore, it should not have been given. Under the evidence as we have stated it, and as it appears in the bill of excep-

tions, we are of the opinion that the court was warranted in giving the instruction. A similar instruction was approved in the case of *State v. Ellis*, 74 Mo. 215, and case of *State v. Dieckmann*, 75 Mo. 570.

It is also insisted that the instruction is erroneous, in this, that it does not require the jury to base their finding 2. INSTRUCTIONS. and belief on the evidence. To sustain this objection, and to make such an omission reversible error, we would not only have to ignore the fact that jurors are at least men of ordinary intelligence, but also the fact that their oaths require them to return their verdict upon the evidence as well as the law. While the instruction is open to verbal criticism, we think the omission complained of is not of that character that would authorize interference with the judgment.

It is also insisted that the instruction is objectionable in this, that it did not tell the jury what was justifiable or excusable homicide. Had there been no other instruction given by the court as to excusable or justifiable homicide, the objection made would be well taken; but as this ground was fully covered in the eighth instruction given, the objection is not well taken.

The seventh instruction is objected to on the ground that while the jury are told that "neither the use of such 3. SELF-DEFENSE: words, nor the demonstrations with said chair apparent danger. can afford defendant any justification or excuse for shooting deceased, unless it was necessary to shoot said deceased in order to prevent him from killing defendant, or doing him some great bodily harm, and the danger of carrying out said design was immediate," they were not further instructed that if defendant had reasonable ground to apprehend great bodily harm, and there was reasonable ground to believe that such harm was imminent, he might act on such appearance and kill the assailant if necessary to avoid the apprehended danger, though it might afterward turn out that the appearances were false and that there was no real danger of death or great bodily harm. It is

insisted that the instruction should have been thus qualified. Such a qualification should only be given in a case
where it would apply to the facts in evidence, and an illustration of the class of cases to which it would apply may
be found in *Selfridge's case*, Selfridge's Trial 160,where Chief
Justice Parker said : "A, in the peaceable pursuit of his
affairs, sees B walking rapidly toward him, with an outstretched arm, and a pistol in his hand, using violent
menaces against his life as he advances. Having approached near enough in this attitude, A, who has a club
in his hand, strikes B on the head before or at the instant
the pistol is discharged, and B dies of the wound. It
turns out that the pistol was loaded with powder only, and
that the real design of B was only to terrify A. Will any
reasonable man say that A is more criminal than he would
have been if there had been a bullet in the pistol ? Those
who hold such a doctrine must require that a man must,
before he strikes the assailant, stop and ascertain how the
pistol is loaded, a doctrine which entirely takes away the
right of self-defense."

The principle is a correct one, and force and effect
should be given to it only in a case where there are some
facts disclosed by the evidence to which it would apply,
and if refused in such a case would be reversible error.
But in the case before us no such facts are disclosed, and
the court did not, therefore, err in refusing to incorporate
it either in the said seventh instruction or in the eighth,
or in refusing to give defendant's second instruction which
announced the principle. The only hostile demonstration
made by deceased, as shown by the evidence, was with a
split-bottomed chair, a real and not an apparent thing.

It is insisted that the eighth instruction should not
have been given because there was no evidence that the
difficulty had been discontinued or that Umfried renewed
the difficulty and assaulted Bartlett. This objection is not
well taken. According to the evidence, before deceased
raised the chair as if to strike, he was seven or eight feet

from defendant, who was sitting on the counter.  When deceased raised the chair he advanced toward defendant, who got off the counter, went into the post-office delivery, passing in six feet of deceased, who stepped back a step or two and set the chair down to his left.  Defendant returned from the room in which the post-office was kept with a cocked revolver in his hand, stepped behind the counter, which put him two and a half feet further from deceased, and with a counter and show-case four and a half feet high between him and deceased, presented his pistol thus cocked, ordered deceased to leave his storehouse, twice, and when a witness spoke to defendant and said :  "Hold on, Umfried," deceased struck around left-handed with the chair knocking the pistol to one side. This evidence tended to show that deceased aimed the blow at the pistol to protect himself against its apprehended discharge, which apprehension seems to have been indulged in by Davis, who witnessed the transaction, as evidenced by his exclamation :  "Hold on, Umfried."

As the instructions given by the court fully and fairly stated the law of self-defense, and what was justifiable or excusable homicide, the court did not err in refusing the instructions asked by defendant, inasmuch as they related to the same matter already covered by instructions that were given.  The mere fact that the homicide was committed in the store-house of defendant, even though *pro hac vice* his dwelling, neither enlarged or limited the law of self-defense.

We find nothing in the record authorizing an interference with the judgment, and it is hereby affirmed, in which all concur.