THE STATE v. JOHN SEBASTIAN, Appellant.

Division Two, December 15, 1908.

1. **MURDER: First Degree: Instruction for Second Degree: No Evidence.** Although there is not sufficient evidence upon which to base an instruction for murder of the second degree and the evidence shows that if defendant was guilty at all it was of murder of the first degree, yet defendant cannot complain that the court did not confine the case to murder of the first degree, but gave instructions authorizing the jury to find defendant guilty of murder of the second degree.

2. **MANSLAUGHTER: Definition.** Where the killing is intentional, manslaughter in the fourth degree may be defined as the intentional killing of a human being in a heat of passion on a reasonable provocation, without malice and without premeditation, and under circumstances which will not render the killing justifiable or excusable homicide.

3. ——: **Provocation.** The general rule is that in order to reduce an intentional killing from murder to manslaughter in the fourth degree, such killing must be done in the heat of passion aroused by a lawful or reasonable provocation, and usually it takes an assault with personal violence to constitute such provocation.

State v. Sebastian.

4. ———: ———: **Instruction: Sufficient Evidence.** Defendant testified that deceased "picked up a corn-knife and struck at me. I was about ten feet from him and he took after me, and I ran I reckon ten or twelve steps, and he commenced hitting me on the shoulder and ear. I never shot until they hit me." *Held,* that this testimony authorized an instruction on manslaughter in the fourth degree. It shows an assault and personal violence before the fatal shot was fired, and an instruction based upon it is in direct harmony with the rules of law applicable to the subject of fourth-degree manslaughter.

5. ———: **Instruction: Informal, But Non-Prejudicial.** It does not follow that because the instruction on manslaughter of the fourth degree does not fully conform to the precedents, the judgment of conviction of murder of the second degree will be reversed. If whatever error appears in the language employed did not prejudice the rights of defendant, but all the necessary elements of fourth degree manslaughter are substantially set out therein, the instruction is not reversible error.

6. ———: ———: **Intentional Omission.** If the instruction did not in express terms require the jury to find that the killing was intentionally done, yet if it did expressly require them to find that defendant, while in a heat of passion, aroused by an attempt to do him personal violence, shot the deceased and from such shooting deceased died, it cannot be said that the rights of defendant were prejudiced by the omission. But it is better to follow the precedents and to expressly require the jury to find that the killing was intentionally done.

7. **SELF-DEFENSE: Bringing on Difficulty, Etc.: Instruction.** An instruction which tells the jury that if defendant sought or brought on or provoked the difficulty with deceased in order to have a pretext for killing him, or doing him some great bodily harm, and actuated by such intent and motive, if such was the fact, the defendant fired the fatal shot, then he cannot avail himself of the plea of self-defense, however sorely he may have been pressed by his adversary; and then, by way of qualification to that charge, directs them that if, on the other hand, they should find that defendant brought on or provoked the combat, and yet, if thereafter and before the fatal shot was fired, defendant, with the honest purpose of abandoning further combat with deceased, did abandon the same and withdrew as far as he could, or fled, and that deceased still pursued him, then he had the right, if in self-defense as hereinafter explained, to slay deceased, is not erroneous but is in perfect accord with State v. Partlow, 90 Mo. 608, and State v. Gordon, 191 Mo. 114.

8. ———: ———: ———: **Qualification.** Nor was it error to embrace that qualification in another instruction defining self-defense, otherwise free from criticism, though unnecessary.

9. ————: **Refusing Defendant's Instructions.** Where the court has given an appropriate instruction fully covering the subject of self-defense, it is not error to refuse to give other instructions asked by defendant on the same subject.

10. **NEW TRIAL: Newly-Discovered Evidence: Impeachment.** Newly-discovered evidence, the object of which is merely to impeach the character or credibility of a witness, does not furnish a sufficient basis for the granting of a new trial. Affidavits going to show that a principal witness for the State in the murder trial has previously been guilty of the crime of larceny, do not present a sufficient ground for a new trial. They could have no other purpose and effect than to impeach the witness's character and credibility, and even if the witnesses had been called they would not have been permitted to detail the facts showing the larceny, but confined to testimony concerning the witness's reputation for integrity and honesty.

11. ————: **Misconduct of Sheriff.** A juryman asked the sheriff, "Can we go before the judge and tell him how we stand?" To which the sheriff replied, "No, you are expected or supposed to have a verdict of some kind before you go into court." *Held*, that it is extremely doubtful whether the sheriff's response would furnish a satisfactory reason for granting a new trial, but without so deciding and putting that phase of the point aside, it yet remains that the assignment was one pre-eminently for the determination of the trial judge, and as he decided it was not such conduct as required a new trial and there appears nothing arbitrary about his ruling, the Supreme Court will not make a contrary ruling.

Appeal from Monroe Circuit Court.—*Hon. D. H. Eby,* Judge.

AFFIRMED.

*J. H. Whitecotton, W. W. Barnes* and *A. T. Stuart* for appellant.

(1) (a) Defendant insists that under all the evidence, instruction 6, on second degree murder, should not have been given. The evidence tends to prove murder in the first degree, or justifiable homicide, only. The case was tried on the theory, by the State, that defendant "brought on or provoked the combat." This being the theory of the State, and supported as it claims by the testimony, this instruc-

tion should not have been given. State v. Kilgow,
70 Mo. 546. (b) Defendant complains of the action
of the court in giving instruction 8, being for man-
slaughter in the fourth degree, and insists that the
testimony does not warrant the giving of said instruc-
tion. Also contends that it does not properly declare
the law. "This instruction is faulty in that it does
not require the jury to find that the defendant inten-
tionally shot and killed deceased." State v. Umfried,
76 Mo. 404; State v. McKenzie, 177 Mo. 712; State
v. Elsey, 201 Mo. 571. (c) We insist that the facts
do not authorize such an instruction, even if it proper-
ly declared the law. This court has often ruled that
however proper an instruction may be as an abstract
proposition of law, it is error to give it when the facts
in evidence do not justify it. State v. Gordon, 191
Mo. 114; State v. Elsey, 201 Mo. 561. (d) If under
the facts an instruction on manslaughter in the fourth
degree would be proper, it was reversible error to
give instruction 8 in the language it was given, although
defendant was convicted of a higher degree of homi-
cide. State v. Barnett and Baker, 203 Mo. 662. (e)
Instruction 12 does not declare the law of self-defense
in this case, under the evidence. There is no evidence
authorizing the conditioning it with "the bringing on
the difficulty or provoking the combat." There was
no evidence that defendant sought the difficulty for the
purpose of wreaking his vengeance on Sager. State
v. Smith, 120 Mo. 2; State v. Roff, 142 Mo. 448; State
v. Gordon, 191 Mo. 114. (f) Defendant complains of
instruction 12 for the further reason that there is no
evidence tending to show that defendant "sought and
brought on or provoked the combat" with Sager, either
with or without a felonious intent. State v. Elsey, 201
Mo. 561; State v. Gordon, 191 Mo. 114. (2) The
motion for a new trial should have been sustained,
on account of newly-discovered evidence. The convic-

tion in the case was secured solely on the testimony of Frank Sager, and while the newly-discovered evidence appears to violate the holding of this court that when the evidence tends ''merely to impeach the character or credit of a witness'' the motion should not be sustained, we insist that this strict rule should not be made to apply in this case, when the impeachment of the witness would inevitably result in the acquittal of defendant. State v. Speritus, 191 Mo. 24. (3) Defendant insists that owing to the misconduct of A. D. Buford in charge of the jury a new trial should have been granted. Section 2629, Revised Statutes 1899, requires that after the argument is concluded the jury should retire under the charge of an officer, who shall be sworn to keep them together in some private room or place and not to permit any person to speak or communicate with them. It is clearly shown by the affidavits filed that the sheriff did communicate with the jury.

*Herbert S. Hadley,* Attorney-General, and *F. G. Ferris,* Assistant Attorney-General, for the State.

(1) The indictment substantially charges every essential element of the offense of murder in the first degree. In charging murder it is not necessary to allege that the weapon was deadly and dangerous. Joyce on Indictments, pp. 318, 736; State v. Hottman, 196 Mo. 122; State v. McDaniel, 94 Mo. 301; State v. Horn, 204 Mo. 532; 1 McClain on Criminal Law, p. 221, n. 6; p. 353. (2) While the evidence on the material points was in hopeless conflict, that for the State, if true, was overwhelming against defendant, and amply sufficient to sustain the verdict of murder in the second degree. State v. Long, 209 Mo. 388. (3) (a) Defendant complains that the court erred in instructing on any other crime or offense than murder in the first degree and justifiable homicide. Our statute pro-

vides that the jury may find the accused guilty of any degree of homicide inferior to that charged in the indictment; and it being the duty of the jury, and not that of the court, to say of what degree, if any, defendant is guilty, it is necessary for the court to instruct the jury as to all the grades or degrees of homicide concerning which there is any evidence. R. S. 1899, sec. 2369; 1 McClain on Crim. Law, sec. 391; State v. Frazier, 137 Mo. 340. Surely it may not be said that there was no evidence to justify an instruction on murder in the second degree. State v. Frazier, supra. (b) Defendant, having been found guilty of murder in the second degree, should be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of murder in the first degree. R. S. 1899, sec. 2369. (c) Even if the evidence did not warrant an instruction for murder in the second degree, defendant is in no position to complain, for, if the court erred in instructing for a lesser degree of murder than that with which defendant is charged, it was an error in his favor. A verdict will not be disturbed for any error committed in favor of defendant, ''nor because the evidence shows, or tends to show, him to be guilty of a higher degree of the offense than that of which he is convicted.'' R. S. 1899, sec. 2535; State v. Todd, 194 Mo. 394; State v. Billings, 140 Mo. 205; State v. Nelson, 88 Mo. 126. (d) Under the evidence the court properly instructed the jury on manslaughter in the fourth degree. State v. Sharp, 187 Mo. 723; State v. McKenzie, 177 Mo. 710. (e) Even though such instruction incorrectly defined the offense of manslaughter in the fourth degree, the error could not have been prejudicial to defendant, and would not entitle him to a reversal of the judgment of conviction of murder in the second degree, a higher grade of crime. State v. Ellis, 74 Mo. 207; State v. Ward, 74 Mo. 253; State v. Hicks,

178 Mo. 433; State v. Smith, 80 Mo. 516; State v. Mc-
Mullin, 170 Mo. 631. (4) (a) The finding of the
trial court upon affidavits pro and con, as to the alleged
misconduct of the jury, will be presumed to be fair
and impartial, and will not be disturbed upon appeal,
except for reasons the most clear and manifest. State
v. Taylor, 134 Mo. 161; State v. Howard, 118 Mo. 136;
State v. Page, 212 Mo. 224. Had all the affidavits of-
fered been considered, the circuit judge may well have
found that the statement complained of and attributed
to Buford was not made. (b) In passing upon this
point, the affidavits of jurors offered by defendant
should not be considered. While the affidavits of jurors
may be received to sustain their verdict, the rule that
jurors will not be allowed to impeach their own verdict
by statements or affidavits is inflexible. Thompson and
Merriam on Juries, secs. 440, 446; State v. Palmer,
161 Mo. 175; State v. Underwood, 57 Mo. 40. (c)
When communications between members of the jury
and the officer having them in charge are such that
it is obvious that no prejudice could have resulted from
them, they will not afford ground for a new trial.
Thompson & Merriam on Juries, sec. 362; Leach v.
Wilbur, 9 Allen 212; Pope v. State, 36 Miss. 134. (5)
Defendant asks that he be given a new trial because,
after the verdict was rendered, he for the first time
discovered that Frank Sager, who had testified as a
witness for the State, had been guilty of grand larceny
and burglary, and that his reputation generally, in
the community in which he lived, for honesty, integrity,
truth and veracity, was bad. The alleged newly-dis-
covered evidence as to said witness could have no pur-
pose or effect other than to impeach the character and
credit of said witness. In order to support a motion
for a new trial on the ground of newly-discovered evi-
dence, the party must show that the object of the testi-
mony is not merely to impeach the character or credit

of a witness. State v. McKenzie, 177 Mo. 716; State v. Welsor, 117 Mo. 582; State v. Rockett, 87 Mo. 666; State v. Butler, 67 Mo. 59; State v. Estes and Johnson, 209 Mo. 306.

FOX, P. J.—This cause is now pending before this court upon appeal by the defendant from a judgment of the circuit court of Monroe county, Missouri, convicting him of murder in the second degree. On the 14th day of December, 1906, the grand jury of Monroe county returned an indictment against the defendant charging him with murder in the first degree, which indictment, omitting formal parts, was in the following form:

"The grand jurors for the State of Missouri, summoned from the body of Monroe county, being duly impaneled, charged and sworn to inquire within and for the body of said Monroe county, and true presentment make upon their oaths present and charge that John Sebastian, at and in the county of Monroe and State of Missouri, on the twenty-fourth day of October, in the year of our Lord one thousand nine hundred and six, in and upon one Benjamin Sager, in the peace of the State, then and there being feloniously, wilfully, deliberately, premeditatedly and on purpose and of his malice aforethought, did make an assault, and that the said John Sebastian, a certain revolving pistol, then and there charged with gunpowder and leaden balls, which said revolving pistol he, the said John Sebastian, in his right hand then and there had and held, against, at and upon him the said Benjamin Sager, then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did discharge and shoot off, to, against, at and upon him the said Benjamin Sager; and that the said John Sebastian, with the leaden balls

215 Sup—5

aforesaid, out of the revolving pistol aforesaid, then
and there by the force of the gunpowder aforesaid by
the said John Sebastian discharged and shot off as
aforesaid, then and there feloniously, wilfully, deliber-
ately, premeditatedly, on purpose and of his malice
aforethought, did strike, penetrate and wound him, the
said Benjamin Sager, then and there feloniously, wil-
fully, deliberately, premeditatedly, on purpose and of
his malice aforethought, giving to him, the said Ben-
jamin Sager, in and upon the left side a little under
the second rib, of him the said Benjamin Sager, one
mortal wound, of the depth of six inches and of the
breadth of one-half inch, of which said mortal wound
he, the said Benjamin Sager, then and there instantly
did die.

"And so the grand jurors aforesaid, upon their
oath aforesaid, do say, that the said John Sebastian,
him, the said Benjamin Sager, then and there, in the
manner and form and by the means aforesaid, at
the county aforesaid, on the day aforesaid, feloniously,
wilfully, deliberately, premeditatedly, on purpose and
of his malice aforethought, did kill and murder; con-
trary to the form of the statute in such cases made
and provided and against the peace and dignity of
the State."

To this indictment the defendant waived a formal
arraignment and entered his plea of not guilty, and
on the 4th day of January, 1907, the trial of this cause
was begun. The testimony introduced on the part of
the State at the trial tended to prove that the defend-
ant and deceased were both farmers, residing five or
six miles northwest of Paris on adjoining farms in
Monroe county. The deceased had a corn field rented
from defendant on shares, and there seemed to have
been some dispute between them about the division
of the corn. Most of the corn had been cut on October
24, 1906, when Frank and Claude Sager, both sons

of the deceased, taking with them a two-horse wagon, went to the field in question and began gathering corn, which the deceased claimed. This was about 8:30 a. m. In about twenty minutes the defendant and Bradley Overfelt, who was working for him, came into the field and began working on a fence, some thirty or thirty-five rods from the Sager boys. In a little while the defendant came over to where the boys were at work. When he discovered that they had three or four bushels of corn in the wagon, he said, "Say, boys, do you know you are gathering my corn?" After Claude Sager replied that they were not, the defendant said, "Well, you are," and got up into the wagon and began throwing the corn out. Claude Sager also got into the wagon and tried to keep the defendant from pitching the corn out. Claude Sager took out one of the false standards in the wagon and the defendant took the other. Claude got down and defendant threw the corn out of the wagon and got down on the ground also. The defendant started up to Claude and said: "Say, young man, I just as soon knock your brains out and bury you right here as do anything else," and knocked Claude's hat off with said standard. The defendant further said, "God damn you, you are not the one I wanted to see; that is your daddy, go and get him." Immediately Claude Sager left for his home, but soon returned in company with his father. In the meantime, the defendant talked to Frank Sager about the corn. Frank declined to engage in any conversation with him, but asked him to go over where Bradley Overfelt was fixing the fence. Finally the defendant left and went off to work, but returned to the wagon shortly after the deceased and Claude Sager arrived there. As soon as the deceased arrived at the wagon, he and his two boys began throwing into the wagon the corn that defendant had thrown out of it. The defendant came up and said to the deceased, "Say, Ben, do you

know you are gathering my corn?" and the deceased replied that he was not. The defendant said, "Well, you are, and I am going to have it." Immediately the defendant pulled his pistol from his pocket and fired one shot. There were two corn-knives in the hind end of the wagon which the Sagers had been using the day before. Deceased grabbed one of them,. and, as he turned towards the defendant, the defendant fired the second shot at deceased. This shot took effect in the deceased, and he fell to the ground. Claude Sager, taking the other corn-knife, started around the corn pile toward where the defendant was standing. Just as he was near the defendant, getting ready to strike at him, the defendant fired a third shot, which struck Claude. Frank Sager then began to run, and, looking back as he did so, he saw the defendant fire a fourth shot, which missed Frank. Frank Sager testified positively that his father was stooping down pitching corn into the wagon at the time the defendant fired the first shot. After the fourth shot had been fired, Frank Sager stopped, looked back, and saw the defendant standing over the deceased with his pistol pointing down at deceased, saying something that Frank did not understand. Defendant went away, and Frank and Claude Sager then put the deceased, who was dead, into the wagon and drove home. The evidence further showed that Claude Sager died on November 7, 1906, from the effects of the wound that he received on October 24, 1906.

Dr. C. H. Dickson testified that he lived at Holliday and had been a practicing physician and coroner of Monroe county for nine years. About twelve o'clock on the day of the shooting he was called to the residence of the deceased, and, in company with R. C. Udell, an undertaker, held a post-mortem examination. The doctor testified that he found in the body of the deceased a wound which entered in the upper part of

the left arm one and a fourth inches below the point
of the shoulder, and just a little back of the middle
of the arm.    The bullet passed through the fleshy
part of the arm, entered the cavity between the sec-
ond and third ribs, passed through the upper lobe of
the left lung just in front of the back bone, through
the middle lobe of the right lung, and fracturing the
upper part of the fourth rib a little in front of the
shoulder blade.    The direction of the wound diverged
about an inch and a quarter from a perpendicular line
drawn through the body.    The bullet deflected about
the same downward as backward from a perpendicu-
lar meridian line.    The shirt, undershirt and coat worn
by the deceased on the occasion were identified and
offered in evidence.    These garments showed that the
bullet entered the body of the deceased, as testified
to by Coroner Dickson and Undertaker Udell.    De-
ceased was about five feet eight inches tall and weighed
about 150 or 160 pounds.    Defendant was about six
feet tall and weighed about 180 pounds.

The testimony introduced on the part of the de-
fendant tended substantially to show the following
state of facts:

The defendant testified that he was suffering with
rheumatism and sore eyes at the time of the difficulty;
that he was 61 years old, a farmer, and the father of
twelve children.    He testified that a few days before
the final difficulty, he and his two girls visited the corn
field in question, where the deceased was using a corn
binder.    The defendant remarked to the deceased that
the rows did not come out even, as they should have
done if he had correctly counted them.    The deceased
got mad, said he did not want any of the defendant's
corn, and commenced swearing.    The defendant re-
plied that he didn't say that the deceased wanted any
of his corn, but had simply remarked that the rows
did not come out even.    The defendant then sent his

girls to the house, and the deceased said: "God damn him, I will kill him." The defendant asked whom he was going to kill, and the deceased replied, "You, God damn you, you son-of-a-bitch." At that the defendant turned around and walked to the house and did not see the deceased any more until the morning of the difficulty. The defendant admitted going to the field on the 24th of October, 1906, in company with Bradley Overfelt, and seeing Claude and Frank Sager at work with a wagon near by. He denied knocking Claude's cap off of his head, denied threatening to knock his brains out, and also denied saying that it was not Claude but his father that he came after. The defendant claimed that when he came within ten or fifteen steps of the Sager boys, Claude said they were going to have that corn, and that Claude then went to the house to get his father. Believing that there would be trouble, the defendant went to his house and got his pistol, which he carried back to the fence where Bradley Overfelt was at work. In a little while the defendant saw the deceased throwing corn into the wagon, whereupon defendant went up to within twenty-five steps of him and said, "Mr. Sager, that is my corn you are throwing in the wagon." The deceased made no reply, but the defendant repeated said remark. Whereupon the deceased said, "It is not yours, it is mine, and I am going to have it." The deceased stepped to the hind end of the wagon, picked up a corn-knife and started across the corn pile toward the defendant. The defendant said, "Hold on, Mr. Sager, let me reason with you." To this the deceased replied that he would not reason with him; and the defendant said he did not want to have any trouble with the deceased. The deceased started towards the defendant with the corn-knife and struck at him. He was then about ten feet from the defendant and running toward the defendant, saying as he raised the

knife, "I will cut your damn head off; get your knives, boys, and come on," and defendant thought all had a corn-knife apiece.    The defendant turned and began to run.    The deceased commenced hitting at the defendant with the corn-knife, and struck him on the shoulder and on the ear.    Defendant, looking back, saw Sager with his arm back about to strike, and thinking that the deceased was intending to kill him, the defendant drew his pistol and fired over his shoulder two shots as quick as he could, running all the time. He said he did not know but they were all running after him.    After getting some fifteen or twenty steps away the defendant saw Claude Sager running upon his left side, and at the same time Claude struck the defendant with the corn-knife, inflicting a wound on the head.    The defendant, still running, fired over his shoulder at Claude, as Claude was about to strike again, but did not know that the shot struck Claude. Claude turned and started back around the corn pile toward the team.    Defendant and Bradley Overfelt walked up to the deceased, who was lying on his face on the ground, and asked him if he was hurt.    Seeing that the deceased was probably dead, and fearing additional trouble with his sons, the defendant returned to his house.

In some particulars the defendant was corroborated by his neighbor, Henry Secoy, who testified that he was working in an adjoining corn field and saw the deceased riding rapidly toward the corn field, riding his spotted pony and carrying what he supposed was a corn-knife.    He heard the deceased say, "Come up here, I will settle that when I get there."    He also testified that he heard the three shots fired, and that in a little while he climbed on the fence and saw the Sager boys get into the wagon and start away.    He also saw the defendant and one of his girls go through the gate going towards defendant's barn.

Defendant's daughter, Nina, testified that she was at her father's house, about two hundred or three hundred yards from the scene of the homicide, and, as she stepped into the back yard to get some chips, she saw Sager riding rapidly into the field on his pony. He dismounted at the wagon, and she saw him and his two boys throwing corn into the wagon.      She also saw her father and Bradley Overfelt approach the wagon, and, when they got there, she saw Sager and his two boys jump up and run after defendant with something in their hands, striking at him.      They all passed from her view behind a bunch of trees, whereupon she heard three shots.

The defendant introduced several witnesses who testified that two corn-knives were found on the ground near the pile of corn, the larger of said knives being found near where there was some blood on the ground and on the corn stalks.      Other witnesses for the defense testified to the bloody condition of the defendant immediately after the shooting, and to the fact that he had one wound on his head and one wound on his ear, both of which were made with some sharp instruments.      Hearing of the difficulty, Sheriff Nolen started out from Paris and met the defendant on the road going toward the county seat.      He turned and went back with the defendant, and, with some others, visited the scene of the difficulty.      He testified to the condition of the ground, the corn-knives and the pile of corn.      Nolen also testified that, while he was with the defendant that day, defendant took his revolver out of his pocket and said, "I just stood my ground and shot them (indicating by pointing with his revolver) just as they came to me, or came at me."

Bradley Overfelt, in many respects, corroborated the defendant.      He and the defendant both claimed that the defendant's hat was knocked off during the fight between the defendant and the three Sagers.

Overfelt said that, when defendant came back from the house, he told Overfelt that he expected he would have trouble with Sager, and that he had his revolver to defend with.

The defendant introduced several witnesses, who testified to the fact that the deceased's general reputation for peace and order was bad.    There was also some evidence tending to contradict Frank Sager in reference to statements made by him on the witness stand.

In rebuttal the State offered testimony which tended to prove that the general reputation of Henry Secoy, one of the defendant's witnesses, for truth and veracity was bad; and that Secoy and Overfelt made numerous contradictory statements in relation to the homicide.    Secoy stated, so several witnesses testified, that he knew nothing about the difficulty and was glad that he did not.    The State also proved that the general reputation of the deceased for peace and order was good.    The State introduced Dr. F. M. Moss, who testified that on the afternoon of the killing, the defendant was brought to his office by the sheriff, and that he examined and dressed some wounds of the defendant. One wound was a cut on the forehead, and the other one was a small cut in the ear.    The latter cut passed through the ear and broke the skin behind the ear. This witness testified that both wounds must have been inflicted by someone in front of defendant, and could not have been inflicted by someone behind the defendant.    The State also proved that Bradley Overfelt, one of defendant's witnesses, made divers statements to the effect that the defendant's hat was on during the entire difficulty and that his hat was cut full of holes.

At the close of the evidence the court instructed the jury, covering the offenses of murder of the first and second degrees, as well as manslaughter in the

fourth degree, and upon justifiable homicide, reasonable doubt, and other instructions which were applicable to the testimony, and the cause was submitted to them for their consideration. They returned a verdict finding the defendant guilty of murder in the second degree, and assessed his punishment at imprisonment in the penitentiary for a term of ten years.

It is not essential to reproduce at this time all of the instructions given in the cause. Those of them, the correctness of which are challenged, will be given due consideration during the course of the opinion.

A timely motion for new trial, with affidavits in support of it, together with counter affidavits were filed, which will be given consideration in the course of the discussion of the legal propositions involved. A motion in arrest of judgment was also filed. These motions were both overruled by the court. Sentence and judgment were rendered and entered in accordance with the verdict. From this judgment the defendant prosecutes this appeal, and the record is now before us for consideration.

## OPINION.

The record discloses that the defendant duly preserved his exceptions to the giving of all the instructions by the court. However, learned counsel in their brief direct their complaints particularly to instructions numbered 6, 7, 8, 12 and 13. The instructions to which our attention is specially directed are as follows:

"6. The court instructs the jury that if they find from the evidence in the cause, beyond a reasonable doubt, that at Monroe county, in the State of Missouri, on the 24th day of October, 1906, the defendant did wilfully, premeditatedly, on purpose and of his malice aforethought, but without deliberation, shoot Benjamin Sager with a loaded pistol, thereby, then

and there inflicting upon said Sager a mortal wound from which mortal wound, if any, the said Sager thereafter, and on said 24th day of October, 1906, at and in the county and State aforesaid died, then you will find the defendant guilty of murder in the second degree, and assess his punishment at imprisonment in the penitentiary for a term not less than ten years.

"7.    The court instructs the jury that if they find from the evidence that at the county of Monroe, in the State of Missouri, on the 24th day of October, 1906, the defendant shot Benjamin Sager with a loaded pistol, thereby, then and there inflicting upon said Sager a mortal wound, if such is the fact, from which said mortal wound, if any, the said Sager thereafter and on said 24th day of October, 1906, at the county and State aforesaid, died, and if the jury further find that the defendant fired said shot while he was in a violent passion, suddenly aroused by insulting or abusive language, if any, spoken by said Sager to defendant, then such killing was not done with deliberation; but although the defendant may have fired the shot, while in a violent passion suddenly aroused by insulting or abusive words, spoken to him by said Sager, yet, if such killing was done by defendant wilfully, premeditatedly and of his malice aforethought as explained in these instructions, the defendant is guilty of murder in the second degree.

"8.    The court instructs the jury that if they find from the evidence in the cause that at Monroe county, in the State of Missouri, on the 24th day of October, 1905, Benjamin Sager, if such is the fact, with a corn-knife, approached the defendant in a threatening manner, and within striking distance, either struck at or struck defendant with said corn-knife, but not under such circumstances as to justify the defendant in shooting in self-defense, as defined in other instructions, and that such assault or striking, if any, by said Sager

provoked on the part of defendant a sudden heat of passion, and that in such heat of passion, if any, the defendant shot said Sager, from which said shooting, if any, the said Sager thereafter, on said 24th day of October, 1906, at the county and State aforesaid, died, then you will find the defendant guilty of manslaughter in the fourth degree, and assess his punishment at imprisonment in the penitentiary for a term of two years, or at imprisonment in the county jail not less than six months nor more than twelve months, or by a fine not less than $500, or at both a fine of not less than $100 and imprisonment in the county jail not less than three months nor more than twelve months.

"12.    The court instructs the jury that if they find from the evidence in the cause that defendant sought and brought on or provoked the combat with Benjamin Sager in order to have a pretext for killing his adversary, or doing him some great bodily harm, and for the purpose of wreaking his the defendant's vengeance upon him, and that, actuated by such intent and motive, if such is the fact, the defendant fired the fatal shot for the purpose aforesaid, then the defendant cannot avail himself of the plea of self-defense, however sorely he may have been pressed by his adversary; on the other hand, although the defendant may brought on or provoked the combat, yet, if thereafter, and before the fatal shot was fired, the defendant with the honest purpose of abandoning further combat with said Sager, did abandon the same and withdraw as far as he could, or fled, and that said Sager still pursued defendant, then the defendant had a right, if in self-defense, as hereafter explained, to slay said Sager.

"13.    The court instructs the jury that if they find from the evidence in the cause that at the time the defendant shot Benjamin Sager, if he did shoot him, the defendant had reasonable cause to appre-

State v. Sebastian.

hend a design on the part of deceased, or others acting in concert with him, if such is the fact, to kill defendant or to do him some great bodily harm, and that there was reasonable cause to apprehend immediate danger of such design, if any, being carried out, and that he shot and killed deceased to prevent the accomplishment of such apprehended design, if any, then such killing was justifiable, unless the jury find from the evidence that defendant provoked the fatal combat for the purpose of killing Sager or doing him some great bodily harm, and for the purpose and with the motive of wreaking his the defendant's vengeance upon said Sager, and fired the fatal shot with such intent and purpose and not for the honest purpose of defending himself from attack. It is not necessary to this defense that the danger should have been real or actual, or the danger should have been intended and immediately about to fall. If you believe that defendant had reasonable cause to believe these facts and that he shot in self-defense, as herein explained, and to prevent such expected harm, then you should acquit. But before you acquit on the ground of self-defense you ought to believe that defendant's cause of apprehension was reasonable. Whether the facts constituting such reasonable cause have been established by the evidence, you are to determine, and unless the facts constituting such reasonable cause have been established by the evidence in the case, you cannot acquit defendant on the ground of self-defense, even though you may believe defendant really thought his cause of apprehension reasonable.''

It will be observed that instructions numbered six and seven were applicable to the offense of murder of the second degree, and it is earnestly insisted by counsel for appellant that the giving of those instructions constitutes error. This insistence is predicated upon the theory, as claimed by the appellant, that there was

no evidence introduced at the trial upon which to base an instruction for that grade of the offense, and it is argued that the case was tried on the theory that the offense committed was that alone of murder in the first degree; hence the complaint that the instruction for murder of the second degree should not have been given.

In view of the well-settled law applicable to this subject, we shall not undertake to discuss the question as to whether or not there was any evidence upon which to predicate an instruction on murder of the second degree. In the treatment of this question it may be conceded, for argument's sake, that there was not sufficient evidence upon which to base the instruction complained of, still, this cannot be of any avail to the defendant, for he is in no position to insist that the court committed error in giving instructions numbered six and seven.

A similar complaint to the one by counsel for appellant was made in State v. West, 202 Mo. l. c. 138. In treating of this proposition by this court, speaking through Judge GANTT, it was said: "It is now objected that the court erred in giving this instruction on murder in the second degree for two reasons, the first being that if the defendant was guilty at all he was guilty of murder in the first degree and it was therefore reversible error to instruct on murder in the second degree. In support of this contention, we are cited by learned counsel for the defendant to State v. Mahly, 68 Mo. 315, in which it was held reversible error to instruct on murder in the second degree when the evidence tended to show that defendant was guilty of murder in the first degree." It is then pointed out that the Mahly case and others were decided before the revision of 1879, in which it was provided for the first time: "Upon indictment for any offense consisting of different degrees as prescribed by this law,

the jury may find the accused not guilty of the offense charged in the indictment, and may find him guilty of any degree of such offense inferior to that charged in the indictment, or of any attempt to commit such an offense, or any degree thereof; and any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide.''

In State v. Todd, 194 Mo. l. c. 394 and 395, Judge BURGESS, speaking for this court, expressly held that even if the testimony did not warrant an instruction for murder in the second degree, ''the defendant is in no position to complain, for if the court erred in instructing for a lesser degree of murder than that with which the defendant is charged, it was error in the defendant's favor, of which he has no cause to complain.'' To the same effect are State v. McMullin, 170 Mo. l. c. 630; State v. Frazier, 137 Mo. l. c. 340; State v. Scott, 172 Mo. 536; Johnson v. State, 44 Tex. Cr. 332, and State v. Billings, 140 Mo. 193.

In the recent case of State v. Bobbitt, announced at the last sitting of this court, and officially reported *ante,* p. 10, this subject was again reviewed, and the cases as herein indicated were referred to and expressly approved. Applying these rules of law applicable to this proposition, which have been so clearly and correctly stated in the cases heretofore cited, we see no escape from the conclusion that the giving of the instructions numbered six and seven did not constitute such error as would furnish a basis for the reversal of this judgment.

Instruction numbered 8, the correctness of which is challenged by appellant, was one covering the offense of manslaughter in the fourth degree. The general rule is that in order to reduce an intentional killing

from murder to manslaughter in the fourth degree, such killing must be done in the heat of passion arous-ed by a lawful or reasonable provocation, and as a gen-eral rule it takes an assault with personal violence to constitute such provocation. Where the killing is in-tentional manslaughter in the fourth degree may thus be defined: It is the intentional killing of a human being in a heat of passion on a reasonable provocation, without malice and without premeditation, and under circumstances which will not render the killing justifi-able or excusable homicide. [State v. McKenzie, 177 Mo. l. c. 712; State v. Hermann, 117 Mo. l. c. 637; State v. Sumpter, 153 Mo. 436; State v. Meadows, 156 Mo. 110; State v. Brown, 64 Mo. 367; State v. Diller, 170 Mo. 1; State v. Ashcraft, 170 Mo. 409; State v. Kin-dred, 148 Mo. 270; State v. Gartrell, 171 Mo. 489.]

Learned counsel for appellant predicate their com-plaints of this instruction upon the grounds, first, that there is no evidence upon which to base it; second, that it is not in proper form; and, third, that the court did not require the jury to find that the defendant intentionally shot and killed the deceased.

We have in the consideration of this proposition read in detail all of the evidence disclosed by the rec-ord, and have carefully analyzed the language em-ployed in the instruction, and have reached the con-clusion that such instruction is not open at least to the principal objection urged against it by the appellant. The testimony of the defendant who testified in his own behalf in this cause, clearly furnishes a basis for the giving of this instruction, and in fact the refusal of an instruction upon manslaughter in the fourth degree, under his testimony, would have constituted error. The defendant, in giving an account of this difficulty, referring to the deceased, said: "He picked up a corn-knife and struck at me, I was about ten feet from him and he took after me, and I ran I reckon ten

State v. Sebastian.

or twelve steps, and he commenced hitting me with the
corn-knife on the shoulder and ear.    I never shot until
they hit me."  .

We have in that testimony an assault and personal
violence before the fatal shot was fired, according to
the testimony of the defendant.    An instruction for
manslaughter in the fourth degree, based· upon that
testimony, is directly in harmony with the rules of
law as announced in the cases heretofore cited, appli-
cable to the subject of manslaughter in the fourth
degree.    We have in this case a killing done by the
use of a deadly weapon, that is to say, a pistol, and,
according to the testimony of the defendant, such kill-
ing was not done until after the defendant had received
at the hands of the deceased personal violence in the
nature of a blow with a corn-knife; therefore, we are
of the opinion that it was quite appropriate for the
court to submit to the jury, upon the testimony of
the defendant, the question as to whether or not the
hitting of him prior to the shooting constituted a rea-
sonable provocation, and the sufficiency of such prov-
ocation to arouse in the defendant such a heat of pas-
sion as would render the killing under its immediate
influence simply manslaughter in the fourth degree.

While this instruction does not fully conform to
the precedents indicated in the cases cited, yet in our
opinion this failure does not constitute such error as
would warrant this court in reversing the judgment.
Whatever errors appear in the language employed,
did not in any way prejudice the rights of the defend-
ant.    It substantially tells the jury that if the de-
ceased, Benjamin Sager, approached the defendant in
a threatening manner, and within striking distance,
either struck at or struck defendant with a corn-knife,
but under such circumstances as not to justify the
defendant in shooting in self-defense, as defined in

other instructions, and that such assault or striking, if any, by said Sager, provoked on the part of the defendant a sudden heat of passion, and that in such heat of passion, if any, the defendant shot said Sager, which shooting resulted in the death of said Sager, then they will find the defendant guilty of manslaughter in the fourth degree.

It will be observed that that instruction, in directing the jury as to the violence necessary to reduce the grade of the crime to manslaughter in the fourth degree, tells them that if he struck him, or struck at him, this, with other elements of the offense, designated in the instruction, would authorize the finding of the defendant guilty of manslaughter in the fourth degree. Upon the testimony of the defendant the court would have been warranted in limiting the finding of the jury to the striking of the defendant, and could have very well omitted part of the instruction in reference to the striking at him. The defendant in his testimony said not only that he struck at him, but that he hit him, and that he did not shoot until after he was struck by the deceased.

It will be conceded that this instruction did not in express terms require the jury to find that the killing was intentional, but it will be observed that it did expressly require the jury to find that the defendant, while in a heat of passion, shot the deceased, Benjamin Sager, and from such shooting that Sager on the 24th day of October, 1906, died. Technically, under the rules announced in the cases heretofore cited, as applicable to the facts of this case, it would have been better form to have followed the precedents and required the finding of an intentional killing. However, we are unwilling to say that this in anyway prejudiced the rights of the defendant, or in the least endangered a fair and impartial trial. The jury were required to find that the defendant shot the deceased,

and they clearly had no trouble, under the undisputed evidence, in finding that fact; then they were told that if they found that he shot him, and that such shooting was done in a heat of passion provoked by a reasonable provocation, from which shooting death resulted, they would find him guilty of manslaughter in the fourth degree. This instruction clearly, by omitting the express requirement to find that the killing was intentional, did not harm the defendant. It is manifest that the jury readily found that the defendant shot the deceased, and it is equally apparent that upon the conflict of evidence they did not find that such shooting was done in the heat of passion upon a reasonable provocation. But aside from all this, we are unable to see how the jury could find that the defendant shot the deceased, under the circumstances as mentioned in the instruction, without necessarily reaching the conclusion that such shooting was intentional, for it must not be overlooked that the instruction required the jury to find that the defendant had been provoked by a reasonable provocation sufficient to arouse a heat of passion, and under those conditions shot the deceased. If he did not intentionally shoot him, then the requirement of the finding that a reasonable provocation sufficient to arouse a heat of passion was the cause of the shooting, would have no place in such instruction.

In State v. Elsey, 201 Mo. 561, it will be observed that this court was content in its criticism of an instruction which did not require the jury to find the defendant intentionally shot and killed the deceased, with simply saying that the instruction was faulty by reason of that fact. Neither that case nor the cases of State v. Umfried, 76 Mo. 404; State v. McKenzie, 177 Mo. 699; State v. Todd, 194 Mo. 377, go to the extent of holding that the defect pointed out in the

instruction would constitute such error as would require the court to reverse the judgment.

Appellant also insists that instructions numbered 12 and 13 did not properly declare the law. Directing our attention to instruction numbered 12, it is sufficient to say that we have examined it and have given it careful consideration, and in our opinion the challenge to the correctness of that instruction is without merit. It simply tells the jury that if the defendant sought and brought on or provoked the difficulty with Sager in order to have a pretext for killing him, or doing him some great bodily harm, and for the purpose of wreaking his vengeance upon him, and actuated by such intent and motive, if such was the fact, the defendant fired the fatal shot, then he cannot avail himself of the plea of self-defense, however sorely he may have been pressed by his adversary. Then the court by appropriate directions to the jury added a qualification to such instruction, and told the jury that on the other hand, even if they should find that the defendant brought on or provoked the combat, yet, if thereafter and before the fatal shot was fired, the defendant, with the honest purpose of abandoning further combat with Sager, did abandon the same and withdraw as far as he could, or fled, and that said Sager still pursued defendant, then the defendant had a right, if in self-defense, as hereinafter explained, to slay said Sager.

This instruction is in perfect accord with not only the case of State v. Partlow, 90 Mo. 608, but as well with the recent case of State v. Gordon, 191 Mo. 114. In the Gordon case the authorities were exhaustively reviewed, and Judge GANTT, after a thorough discussion of the cases cited, said: ''Thus it will be observed that in Partlow's case this court held that the right of perfect or imperfect self-defense depended upon the intent with which the assailant brought on the

quarrel. If he provoked the combat, or produced the occasion in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder of the first degree, no matter to what extremity he may have been reduced in the combat. If, on the other hand, he had no felonious intent, intending merely an ordinary battery, and during the progress of the fight is compelled to take the life of his adversary in order to save his own, he is guilty of manslaughter; or if, having entered into a fight without felonious intent, he seeks in good faith to abandon it and withdraws as far as he can, and his adversary still pursues him, then if necessary to save his own life he slay his opponent, he will be justified.'' Measured by the rules of law as announced in that case, instruction numbered 12, as applicable to the facts developed upon the trial in the case at bar, was clearly proper.

It is, however, suggested by counsel for appellant that there was no testimony upon which to predicate this instruction. In this learned counsel for appellant have certainly overlooked the disclosures of the record. The testimony as introduced on the part of the State shows that when the two sons of the deceased went out in the field to gather corn it was about half past eight o'clock. The defendant in company with Bradley Overfelt came into the field and began working on a fence some thirty or thirty-five rods from the Sager boys. In a short time the defendant came over to where the boys were at work. When he discovered that they had three or four bushels of corn in the wagon, the defendant said: ''Say, boys, do you know you are gathering my corn?'' Claude Sager replied that they were not. The defendant then said, ''Well, you are,'' and got up into the wagon and began throwing the corn out. Claude Sager also got into the wagon and tried to keep the defendant from pitching the corn

out. Claude Sager took one of the false standards in the wagon and the defendant took the other. Claude got down and defendant threw the corn out of the wagon and got down on the ground also. At this point, of the trouble the defendant started up to Claude and said: "Say, young man, I just as soon knock your brains out and bury you right here as do anything else," and proceeded to knock Claude's hat off with the wagon standard. It was also shown in evidence that in this preliminary conversation and dispute with the boys the defendant said: "God damn you, you are not the one I wanted to see; that is your daddy; go and get him." The defendant then left and after the deceased, Benjamin Sager, got there returned with his pistol. It is not necessary to further discuss the testimony. The facts to which we have directed special attention manifestly furnish a sufficient foundation for the instruction given concerning the seeking of this difficulty.

Recurring to instruction numbered 13, it is only necessary to say that that instruction was one upon self-defense, and it substantially declared the law upon that subject as has repeatedly met the approval of this court. The embracing of the qualification in that instruction, which was practically the same as in instruction numbered 12, did not render it fatally defective. While it may be said that the principal part of the qualification having been given in another instruction, there was no necessity for embracing it in the one upon self-defense, yet the mere fact that it was inserted therein does not constitute reversible error.

## II.

It is next urged that the court committed error in its refusal of instructions numbered 5, 6 and 6½, requested by the defendant.

We have carefully considered those instructions. They sought to cover the subject of self-defense. The court, in our opinion, by an appropriate instruction, had fully covered that subject, but in addition to that it may be truly said that the instructions requested at least slightly savored of an address or argument to the jury, and the court in our judgment properly declined the request.

## III.

It is next insisted in the brief of counsel for appellant that the court committed error in its action refusing to grant a new trial upon the ground of newly-discovered evidence. It is conceded that the newly-discovered evidence, by which it is sought to obtain a new trial, consists of the testimony of numerous witnesses tending to show that Frank Sager, one of the witnesses introduced by the State, had been guilty of the commission of the offense of larceny. The affidavits of the witnesses undertake to set forth in detail all of the acts which were committed by Frank Sager necessary to constitute the offense of larceny. It is clear that had these witnesses been discovered and introduced upon the trial they would not have been permitted to testify to the details of the commission of any particular offense, but their examination would have been confined and limited to the inquiry as to the general reputation of Frank Sager in the neighborhood in which he resided for honesty and integrity. That this newly-discovered evidence suggested by appellant could have no other purpose or effect than to impeach the character and credit of the witness, Frank Sager, is not disputed.

This subject is by no means a new one in this court. It has repeatedly been in judgment before us and the cases are all in harmony that newly-discovered evidence, the object of which is merly to impeach the

character or credit of a witness, does not furnish a sufficient basis for the granting of a new trial. [State v. McKenzie, 177 Mo. l. c. 716; State v. Welsor, 117 Mo. l. c. 582; State v. Rockett, 87 Mo. 666; State v. Butler, 67 Mo. 59; State v. Estes and Johnson, 209 Mo. 288; State v. Speritus, 191 Mo. 24.]

It will be observed in the case last cited that the newly-discovered evidence was distinguished from the facts in the preceding cases. However, it will be observed that in the discussion of the proposition Judge BURGESS strictly adhered to the well-settled rule that newly-discovered evidence, which would merely have the effect of impeaching the character of a witness, was no ground for the granting of a motion for new trial.

## IV.

This leads us to the final contention of the appellant, which is predicated upon the alleged misconduct of the deputy sheriff, A. D. Buford, who had charge of the jury after the case was submitted to them and they retired to consider of their verdict. The record discloses that the alleged misconduct of the deputy sheriff in charge of this jury consisted of a response made to an inquiry by one of the jurymen. The juryman said to the sheriff, "Can we go before the judge and tell him how we stand?" and the sheriff, it is said, responded, "No, you are expected or supposed to have a verdict of some kind before you go into court." In support of this ground embraced in the motion for new trial the defendant filed affidavits of some of the jurors. It is only necessary to say concerning those affidavits that the rule and practice is well settled that jurors will not be allowed to impeach their own verdicts by any statements or affidavits filed in the cause. [Thompson and Merriam on Juries, secs.

440, 446.; State v. Palmer, 161 Mo. 152; State v. Underwood, 57 Mo. 40.]

There were other affidavits filed by the defendant and counter affidavits filed by the State. Nearly all of the jurors made affidavits in support of their verdict.

At the very threshold of the consideration of this proposition it is sufficient to say that it is extremely doubtful, even though it be conceded that the sheriff made the response contended for by the appellant, whether such response would furnish a satisfactory reason for granting a new trial. However, we shall not undertake to discuss that phase of the question. The affidavits as furnished by the appellant and the counter affidavits by the State were presented to the trial court, and the finding upon that question was adverse to the appellant. In the absence of any arbitrary action of the trial court respecting the determination of this ground in the motion for a new trial, we are inclined, as has been repeatedly said by this court, to adhere to the finding of the trial judge.

In State v. Howard, 118 Mo. l. c. 136, in discussing a similar objection to jurors, Judge SHERWOOD, speaking for the court, said: "The circuit judge possessed far better opportunities than we of determining the very right of the matters here at issue, and as there were affidavits *pro* and *con* on this point; as the trial judge was doubtless acquainted with each of the affiants; as every lawyer knows how easily affidavits impeaching the impartiality of jurors are procured, and when the dangerous consequences which would result from lending too facile an ear to post-trial complaints of this sort are considered, we feel no inclination to hold otherwise on this point than did the trial court."

A similar ruling was made in State v. Taylor, 134 Mo. l. c. 161, where, in discussing this proposition,

it was said: "Relative to the alleged separation of the jurors and other alleged misconduct, the previous forming and expression of opinions by several of them, it is enough to say that the whole matter of this paragraph was examined by the lower court upon affidavits *pro* and *con* and that court having ruled that the verdict should stand, we will not interfere with such ruling unless upon grounds the most clear and reasons the most manifest."

The trial judge passed upon this showing made upon this ground of the motion for new trial, and there being an entire absence of any indication disclosed in the record of any arbitrary action on the part of the trial court, we are inclined, as was ruled in State v. Page, 212 Mo. l. c. 241, to indulge the presumption that the trial judge dealt fairly and impartially with the defendant in its action upon the motion for a new trial.

We have, after a careful consideration of the disclosures of this record, given expression to our views upon the legal propositions involved. The testimony is in irreconcilable conflict. The testimony as introduced by the State furnishes full support to the conclusions reached by the jury. The testimony on the part of the defendant, if relied upon, would have entitled him to an acquittal. But at last, the jury must consider the conflict of testimony. That is their exclusive province, and it is unnecessary to cite the long line of uniform decisions by this court that verdicts will not be disturbed where there is substantial evidence to support them, upon the simple ground that there is a conflict in such evidence.

Entertaining the views, as herein indicated, the judgment of the trial court should be affirmed, and it is so ordered.

All concur.