## THE STATE v. CHARLES HEATH, Appellant.

**Division Two, June 29, 1909.**

1. **INFORMATION: Murder.** The information set out in the statement charges every element necessary to constitute the offense of murder of the first degree, and that embraces all the lower offenses of homicide.

2. **————: Preliminary Hearing.** It is not necessary that the information charge that defendant was afforded a preliminary hearing prior to the filing of the information, nor is it necessary to prove that he was. A prior preliminary hearing is not jurisdictional.

3. **MURDER: Instructions for Lower Degrees.** If there is substantial testimony which shows a state of facts that would reduce the offense from murder in the first degree to some lower degree of the offense, whether introduced by the State or the defendant, whether it be his testimony alone or not, or whether it be true or false, it is the duty of the court to give an instruction submitting that grade of the offense to the jury.

4. **————: Manslaughter.** Where defendant's testimony shows a difficulty between defendant and deceased in which deceased, immediately before the fatal shot was fired, inflicted on defendant personal violence sufficient to arouse a heat of passion, the court should give an instruction on manslaughter in the fourth degree.

5. **————: Withdrawing from Difficulty: Instruction.** An instruction telling the jury that if "defendant did voluntarily engage in the difficulty, yet he had the right to abandon the conflict and retire therefrom, and if it be found from the evidence that he did in good faith so attempt to withdraw," etc.; "provided you further believe from the evidence that the defendant did not enter into the difficulty intending at the time to kill the

State v. Heath.

deceased or do him some great bodily harm," is correct in its first part, but the last clause is erroneous, and contradictory of what precedes.

6. **INSTRUCTIONS: Argumentative: Self-Defense.** The court properly refused to instruct the jury that defendant had a right to go upon the public road and invite a conversation with the deceased, a school teacher, and ask as a parent the school teacher's reasons for whipping defendant's daughter, and if he did so, and thereupon deceased displayed a knife and threatened to cut defendant, and defendant had good reason to believe, etc., then such act of defendant in beginning the conversation under such circumstances was not the beginning of a difficulty that would cut off or abridge the right of self-defense. It was an attempt to comment on certain insolated facts, and entirely too much of an argument.

7. ————: **Carrying Pistol.** Evidence that defendant had been threatened by others than deceased is proper as explanatory of his possession of the pistol at the time of the homicide; but the court did not err in refusing to instruct the jury that the defendant had the right to bear arms in the necessary defense of his person, and that he should not suffer any prejudice in the murder case on account of carrying a pistol, if he had been threatened by others—the defendant not being on trial for carrying concealed weapons.

8. **EVIDENCE: Contradicting Witness.** Where witnesses have testified for the State as to certain threats made by defendant it is not proper to permit defendant to show by others that the witnesses themselves had used the words which they testified defendant had used, unless, while they were testifying, their attention was directed to the particular conversations which it is sought to impeach and to contradict.

9. ————: **Threats: Collateral Issues.** It is proper to permit defendant and his witnesses to testify that he had been threatened by others than deceased, as explanatory of his carrying a pistol; but it is not proper to permit them to go into the details of those threats, for that would be injecting a collateral issue into the case. It was not error to exclude from evidence a threatening note which had been left at defendant's gate sometime prior to the difficulty.

Appeal from Lawrence Circuit Court.—*Hon. F. C. Johnston,* Judge.

REVERSED AND REMANDED.

*M. E. Benton, Felix Lindsay, J. A. Sturgis, W. B. Skinner* and *George Hubbert* for appellant.

(1) Upon the evidence of provocation by violence from deceased at the time and place of the shooting, defendant was clearly entitled to at least an instruction authorizing the finding of a verdict of manslaughter of the fourth degree. State v. Sebastian, 215 Mo. 58; State v. Darling, 199 Mo. 197; State v. Weakley, 178 Mo. 423. (2) The fact that defendant may have first begun or entered into the difficulty with an intent to kill Mosier, did not deprive him of the right to withdraw from the conflict or attempt to do so in good faith, and thereby revive his right of self-defense; and the circuit court was wrong in denying his right to defend himself against the attacks of Mosier with knife and stone, if found to have provoked the difficulty. State v. Partlow, 90 Mo. 627; State v. Cable, 117 Mo. 385. (3) Defendant was entitled to have instruction E given, and to put in evidence the written threat and other facts which authorized him to carry his pistol, but these were denied to him and excluded by the court. (4) The essential rights of defendant to peaceably address the teacher, seeks information with regard to the conduct of his daughter and have the directors take proper action as officers in control of the school, and to freely go upon the roadway in connection with such course, as mentioned in refused instructions D and J, should have been declared to the jury.

*Elliott W. Major,* Attorney-General, and *Chas. G. Revelle,* Assistant Attorney-General, for the State.

(1) Witnesses for State testified that before defendant left the sale he gave utterance in their presence to certain expressions of ill-will and threats against deceased, and that soon thereafter he departed for the scene where the tragedy finally occurred.

Thereafter counsel for defendant offered to prove by other witnesses that sometime after defendant had left the sale where these threats were uttered, certain other persons engaged in conversation and used language similar to that which State's witnesses testified was used by defendant in their presence. Neither defendant nor deceased was shown to be present, but, on the contrary, the evidence and offer disclose that if any such conversations took place they were in the absence of both defendant and deceased, and between altogether disinterested parties. Upon what rule of evidence the admission of these conversations, whether threats, mockery or what, could be predicated, we are unable to conceive. It was mere hearsay of the most pronounced character, and under no circumstances admissible. State v. Evans, 55 Mo. 461; State v. Cooper, 83 Mo. 703; State v. Hack, 118 Mo. 99; State v. Crawford, 99 Mo. 94; State v. Dunkin, 116 Mo. 311. Defendant had laid no foundation for the reception of such evidence for impeachment purposes. The attention of the State's witnesses had not been particularly directed thereto, and no opportunity had been given them to deny or admit that such conversations had taken place. State v. Smith, 114 Mo. 424; State v. Yocum, 117 Mo. 625; State v. Parker, 96 Mo. 393. It did not tend to in any degree impeach any testimony submitted by the State, and however adroitly he may put his question or offer, a party will not be allowed, under the semblance of impeaching a witness, to get hearsay evidence before the jury. Goltz v. Griswold, 112 Mo. 151; Hamburger v. Rinkel, 164 Mo. 154. (2) (a) It is not for the court to single out certain isolated facts favorable to defendant's view, ignoring the facts and circumstances against him, and declare as a matter of law that such isolated facts are entitled to prominence and do not tend to prove any material fact. Such instructions have been uniformly condemned by this court. McFadin v. Ca-

tron, 120 Mo. 274; Railroad .v. Stock Yards, 120 Mo. 565; Jones v. Jones, 57 Mo. 142; Barr v. Kansas City, 105 Mo. 557; State v. Edwards, 203 Mo. 545. (b) Instructions 7, 9 and 10 correctly told the jury that if defendant provoked the combat, or produced the occasion in order to have a pretext for killing his adversary, or doing him some great bodily harm, the killing was murder in the first degree, no matter to what extremity he may have been reduced in the combat. The soundness of this doctrine has been uniformly approved. State v. Gordon, 191 Mo. 124; State v. Feeley, 194 Mo. 322; State v. Vaughan, 141 Mo. 521; State v. Forsha, 190 Mo. 333; State v. Bailey, 190 Mo. 288; State v. Lewis, 118 Mo. 84; State v. Vansant, 80 Mo. 79; State v. Partlow, 90 Mo. 608; State v. McDaniel, 94 Mo. 309; State v. Rose, 92 Mo. 207. (c) It is urged that the court erred in failing to instruct on manslaughter in the fourth degree. The evidence on the part of the State tended to establish that the difficulty which resulted in the death of deceased was sought for and brought on by defendant with felonious intent, and that after having provoked same, he took advantage of it and fatally shot deceased. On the other hand, the evidence on the part of defendant tended to prove that the killing was done in self-defense. In detailing the facts defendant gave not the slightest intimation that he was actuated by any impulse, save that of self-defense from the threatening and approaching movements of deceased towards him with a knife. After stating that deceased was pressing him hard, and striking at him with a knife, and that he had retreated to a point where safety no longer permitted, he stated that he shot deceased in order to keep deceased from cutting him to pieces with the knife. All his evidence tended to prove the same condition. If the jury believed the evidence on the part of the State, defendant was guilty of murder in the first or second degree. If, on the contrary, they be-

lieved the evidence on the part of the defendant, he was not guilty of any offense, but was justifiable in the killing. There was no evidence warranting an instruction on fourth degree manslaughter. State v. Gartrell, 171 Mo. 489; State v. Meadows, 156 Mo. 110; State v. Lewis, 118 Mo. 82; State v. Ramsey, 82 Mo. 137; State v. Dunn, 80 Mo. 690; State v. McCollum, 119 Mo. 475.

FOX, J.—This cause is now pending before this court upon appeal by the defendant from a judgment of the circuit court of Lawrence county, Missouri, convicting him of murder of the second degree.

On the 5th day of August, 1907, the prosecuting attorney of McDonald county filed in the circuit court of that county an information, duly verified, charging the defendant with the murder of Clarence Mosier, which information, omitting formal parts, was as follows:

"Joseph S. Long, prosecuting attorney within and for the county of McDonald and State of Missouri, under his oath of office and on his knowledge, information and belief, informs the court that one Charles Heath, at the county of McDonald and State of Missouri, on the 22nd day of February, 1907, in and upon one Clarence Mosier, then and there being, feloniously, willfully, premeditatedly, deliberately, on purpose and of his malice aforethought, did make an assault, and with a dangerous and deadly weapon, to-wit, a pistol loaded then and there with powder and leaden balls, which he, the said Charles Heath, in his right hand then and there had and held, at and against him, the said Clarence Mosier, on purpose and of his malice aforethought, did shoot off and discharge and with the pistol aforesaid and the leaden balls aforesaid, then and there feloniously, willfully, premeditatedly, deliberately, on purpose and of his malice afore-

thought, did shoot, strike, and penetrate and wound him, the said Clarence Mosier, to-wit, in the front part of the body of him, the said Clarence Mosier, giving to him, the said Clarence Mosier, at the said county of McDonald, and State of Missouri, on the 22nd day of February, A. D. 1907, with the dangerous and deadly weapon, to-wit, the pistol aforesaid, in and upon the front part of the body of him, the said Clarence Mosier, one mortal wound, of the width of about one inch and of the depth of about three inches, of which said mortal wound he, the said Clarence Mosier, at the county of McDonald and State of Missouri, on the said 22nd day of February, 1907, then and there of the mortal wound aforesaid, instantly died, and so the said Joseph S. Long, prosecuting attorney within and for McDonald county, State of Missouri, aforesaid, under his oath of office and upon his knowledge, information and belief does say that he, the said Charles Heath, him the said Clarence Mosier, in the manner and by the means aforesaid, feloniously, willfully, premeditatedly, deliberately, on purpose and of his malice aforethought, at the said county of McDonald and State of Missouri, on the 22nd day of February, A. D. 1907, did kill and murder against the peace and dignity of the State.''

To this information, on August 8, 1907, the defendant entered a plea of not guilty and on the same day he filed an application for a change of venue from McDonald county, alleging bias and prejudice on the part of the inhabitants. On August 14th, said application for a change of venue was taken up and by the court granted, and the cause ordered transferred to Lawrence county. Defendant duly entered into a recognizance for his appearance in said county to which said cause had been transferred, and the cause, in conformity to the order, was transferred to the Lawrence Circuit Court and all proceedings certified to that court. Subsequently, on November 26th, the

trial of said cause was begun. A jury was duly impaneled and sworn to try the cause and the trial was proceeded with.

There is but little dispute as to what the respective witnesses testified to upon the trial of this cause; in fact, learned counsel for appellant in their oral argument practically conceded that the learned Attorney-General had made a reasonably fair statement of the facts as shown by the record disclosing the evidence; therefore, we shall be content with making a brief statement of the facts which the testimony tended to show on the part of the State, as well as of the facts the evidence tended to establish on the part of the defendant.

On the part of the State the testimony introduced substantially tended to prove that the deceased, Clarence Mosier, was teaching the Saratoga public school, and had been so engaged for about seven weeks preceding the tragedy. Defendant was a patron of this school, having in attendance thereat several children, among whom was a daughter named Lou of about sixteen years of age, and a son named John. On February 21st, said Lou Heath violated one of the rules of the school, and Mosier attempted to administer punishment by whipping her. She resisted his efforts and during the encounter that followed she struck him over the head with an iron poker, and thereupon left the school room and went to her home. That evening defendant went to the home of Mr. Crispin, who, together with Mr. Rorark and Mr. Orff, composed the board of directors for that district. While there, he stated that the teacher had sent his daughter Lou home from school, and would not let her return, and he wanted Mr. Crispin to see about the matter, as he wanted his children to go to school. He said he paid more taxes than anybody else, and that if Mosier whipped his daughter or any of his children, he would make him walk a merrier gait than he ever did walk.

On the following morning defendant accompanied his children to school and demanded that Mosier refrain from further punishing his children, saying that he was the largest taxpayer in the district, and his children should not be whipped. Mosier asked defendant to leave the room, saying that he was disturbing the school, and defendant then left and again went to the home of Mr. Crispin. Mr. Rorark, another director, arrived at Crispin's home about the same time, and defendant told the two directors that he wanted one or both of them to see that Mosier didn't whip his daughter. Rorark later said that he had seen Mosier, and had asked him to take no further action in the matter until the directors had acted, and defendant and Rorark thereupon left, and went to a public sale that was being conducted at the home of Mr. Miller. Just before the morning recess Mosier again attempted to punish Lou Heath in the same manner as on the preceding day. After defendant arrived at the Miller sale, he said in the presence of Newt Warvin, "That little school teacher over there was about to whip me, he was going to whip Lou yesterday, and she hit him over the head with a poker and broke up his switch and walked out, and he told her not to return. He can't make a scholar quit school that way. I brought her back this morning and told him what I thought of him, and he told me to get out of the house, as I was disturbing the school. I told him to put me out, and he replied that he knew better. He won't whip her. If he would whip one of my kids, I'd fill him full of lead." At the morning recess, defendant's son, John Heath, who was in school when Mosier attempted to punish Lou Heath, left the school and went to the Miller sale. After arriving there, said John Heath told defendant that Mosier had again whipped Lou. Defendant thereupon said in the presence of Taylor Williams, "I told him not to whip that girl. God damn him, I told him not to whip that girl. I'll go

over there and fix it with him for it.'' He also said
in the presence of Jack Adcock, ''I brought the girl
down to the schoolhouse and told Mosier not to whip
her that morning, not to lay his hands on her, and
if he did, there would be trouble. Mosier told me
that he would give me to understand that he was run-
ning the school, and I told him it was more than he
had been doing.'' He also said in the presence of
George Shields, after being told by his son John that
Mosier had whipped Lou, ''Did he whip her? I'll go
down there and crawl on him.'' He also said in the
presence of William Terry, ''I told him, God damn
him, not to whip that child. This occurred this morn-
ing. I'll fix him when I get there.'' After giving
utterance to these threats, he walked, in company with
his son John and brother, Jack Heath, to the place
where his horse was tied, and after engaging in some
conversation with them, mounted his horse and rode
away in the direction of the schoolhouse. When he
reached the residence of Mr. Crispin, a distance from
the schoolhouse of one hundred and forty yards, he
dismounted, tied his horse at the gate and entered
Crispin's house. He stated that his son John had
come after him, as Mosier had whipped Lou again.
Mrs. Crispin then told him that his daughter had been
to their house and had informed them that Mosier
had again whipped Lou Heath. The clock was then
striking twelve, and Mrs. Crispin announced that din-
ner was ready, and invited defendant to remain. This
invitation he declined, and left the house. The school
had been dismissed for the noon hour, and Mosier and
the school children were coming down the road towards
where defendant then was, Mosier being on the way to
his boarding-house. Mosier, at that time, had in his
hand a small knife with which he was cleaning his
nails. Defendant spoke to Mosier, saying, ''Hello,
hold on there, you damn, dirty devil,'' or words sim-
ilar to these. Mosier thereupon stopped and defend-

ant approached him, saying: "Why did you whip that girl?" Mosier replied that it was because she had violated the rules of the school, and further told defendant to go on and attend to his business, as he wanted to have no trouble with him. Defendant thereupon said that they were going to have trouble whether Mosier wanted it or not. Mosier thereupon walked away in the direction of his boarding-house, saying at the time, "I have got to go home to dinner." Defendant at this time was cursing and abusing Mosier, while Mosier was doing nothing except walking towards his boarding-house. After Mosier had walked a short distance defendant seized two rocks and threw them at Mosier, who dodged one, the other striking him and causing him to fall. Mosier thereupon got up with a rock in his hand and threw same at defendant, and began to run from defendant. Defendant pursued him, and after running some distance, Mosier telling defendant not to follow, defendant, after getting within close proximity to Mosier, pulled out his gun. Mosier stopped and turned, and took hold of the pistol then pointed at him, in an endeavor to push it away, but defendant prevented this by seizing Mosier's hand. Mosier said, "Don't shoot me," at which time defendant replied, "Damn you," and fired the fatal shot. Mosier staggered first from one side of the road to the other and fell, at which place he died. Soon after the shooting defendant's daughter Lou asked him why he had shot Mosier, saying, "I told you not to shoot him." He said, "By God, you are the cause of it." Defendant thereupon mounted his horse, rode by the body of deceased, and returned to Miller's sale, and when he arrived there he told his brother of what he had done, and asked him to care for his children during his absence. His brother gave him fifty or sixty dollars, and defendant left the country, and was not heard of for three or four days, at which time he surrendered to the officers.

The evidence on the part of the defendant tended substantially to prove that defendant resided within about a mile and a half of the Saratoga schoolhouse, and was the father of ten children, some of whom attended the public school, among them being a daughter named Lou and a son named John. He had known Mosier only since he began teaching the school.

On the morning of February 21st, Lou Heath was turning a lead pencil and reading therefrom the lettering in such a way as to make a whispering sound. Mosier accused her of whispering, which she denied, and in this was corroborated by her sisters who were immediately in front of her, and the girl who was sitting with her. Mosier grabbed and began to strike her with a switch, at the same time knocking her against the stove and benches, and badly tearing her clothing. She thereupon seized an iron poker and struck Mosier. He took the poker from her hand and again struck her with the switch, which she grabbed and broke. She thereupon left the school room and went to the home of an uncle, after which she went to her home. On the same evening defendant went to the home of Mr. Crispin, and asked him to see Mosier and induce him to permit his son to use and recite from a reader different to the one adopted by the board. On the following morning defendant, in company with his children, went to the school and asked Mosier to defer further action relative to the school trouble until the board had considered the matter, saying he was willing to submit to the decision of the school board. Mosier declared that defendant had come there to cause trouble, and after agreeing to abide the decision of the school board, ordered defendant from the school room. Defendant thereupon left and went to Crispin's home, where he met two of the directors, Crispin and Rorark, and it was there agreed that the board would meet the following day

and consider the matter. Rorark then went to the schoolhouse and informed Mosier of the arrangement and asked him not to punish Heath's daughter until the matter had been adjusted. Rorark thereupon returned to Crispin's house and he and defendant, together, went to Miller's sale. Just before the morning recess Mosier told Lou Heath that she must take her punishment, whereupon he began whipping and throwing her against the seats. This she resisted, and during the scuffle her clothing was again torn. During the morning recess, which soon followed, defendant's son left the school and in a hack went to the Miller sale, and informed his father that Mosier had again punished his daughter. Defendant thereupon said that he would go and see the board of directors, and after talking to his son and brother left the sale for his home. Crispin's residence was on the way to defendant's home, and when he reached that place he dismounted and entered Crispin's house. Soon thereafter Mrs. Crispin announced that her dinner was ready, and defendant left the house, having promised to be at home at noon. When passing out of Crispin's gate he saw Mosier and addressed him saying, "Hello, Mosier, I want to speak to you a moment." Mosier said, "All right," and stopped. Defendant asked him why he had whipped his daughter after promising not to, and Mosier said it was none of his damn business, and thereupon called defendant a liar. Defendant replied in the same language, when Mosier jumped up in the road, waived his hand and swore that he would cut defendant into shoe strings, as he was the nerviest little man that ever came to Missouri. Defendant told him if he would put down his knife he would strip off and fight him until he was satisfied. Mosier swore that he would not fight any damn, big, six-foot son-of-a-bitch without a knife, and started

towards defendant. As Mosier advanced on him, some of the witnesses testified that defendant threw a rock, whereupon Mosier threw one at him and he another at Mosier. Other parts of the testimony for the defendant tend to show that Mosier, the deceased, and the defendant picked up rocks about the same time and commenced throwing them. The rock thrown by Mosier struck defendant on the head, and Mosier continued to rush towards defendant, all the time striking and cutting at him with the knife. Defendant began to run from Mosier and after retreating some distance, Mosier then being close to him, he turned and continued to back away. Mosier still pursued him, all the time striking and cutting at him with the knife, and at one time cut through his ear. After defendant had retreated a distance of about fifteen steps, and when he had backed up against a fence and could retreat no further, he shot Mosier just as Mosier was making a lunge at him with the knife. "He shot in order to keep Mosier from cutting him to pieces with a knife." After shooting Mosier, defendant returned to the place of the sale, and after getting some money from his brother, left but returned to the county in three or four days, and surrendered to the officers.

Four or five years prior to this difficulty, defendant had had trouble with other parties, and on that occasion a note, together with a bunch of switches, had been left at his gate. He had been threatened with death or great bodily harm.

There was other testimony on the part of the defendant tending to show that the witnesses who testified to threats made by the defendant against the deceased were on unfriendly terms with the defendant, and that the threat as testified to by Williams and Terry, that defendant had said "he would go over and crawl on him" (meaning the deceased) was not in fact true, but that defendant said "he would go over and call on the board." There was other testimony

State v. Heath.

tending to show that the defendant was not at or near the fire where Williams and Terry were when they say they heard threats, and that in fact he was not nearer than thirty or forty steps of the fire.

At the close of the evidence the court instructed the jury upon murder in the first and second degree, as well as upon every subject connected with the commission of the offense which, in the views entertained by the court, were correct declarations of law, applicable to the testimony developed upon the trial. We deem it unnecessary to here reproduce the instructions given or those refused, but during the course of the opinion will give them such attention as in our opinion their importance requires. The cause being submitted to the jury upon the evidence as introduced and the instructions of the court, they returned their verdict finding the defendant guilty of murder of the second degree and assessed his punishment at imprisonment in the penitentiary for a term of forty years.

Timely motions for new trial and in arrest of judgment were filed and by the court taken up and overruled. Sentence and judgment were entered of record in conformity to the verdict returned and from this judgment the defendant prosecuted his appeal, and the record is now before us for consideration.

## OPINION.

The record in this cause discloses numerous assignments of errors as a basis for the reversal of this judgment. However, a number of the errors complained of in the assignment are not discussed or even alluded to by learned counsel for appellant in the brief proper where the legal propositions are presented and discussed. We will give such attention to the complaints of appellant as in our opinion they merit and their importance requires.

## I.

The information in this cause charges every essential element necessary to constitute the offense of murder in the first degree and that embraces all the lower grades of the offense. It is properly verified and is in such form as has repeatedly met the approval of this court. [State v. Kindred, 148 Mo. 270; State v. Barrington, 198 Mo. 23; State v. Privitt, 175 Mo. 207.]

Directing our attention to the suggestion that the information does not allege that the defendant was afforded, prior to the filing of such information, a preliminary examination, it is sufficient to say that this allegation was not essential. It has been repeatedly held by this court that the provisions of the statute concerning a preliminary examination go merely to the regularity of the preliminary proceedings respecting the arrest and trial, and by no means is the question of preliminary examination jurisdictional in the sense that the State must in a prosecution by indictment or information allege and prove that a preliminary examination has been afforded the accused. This proposition has been set at rest by the express rulings of this court, as well as in other jurisdictions. [State v. McKee, 212 Mo. 138; Washburn v. People, 10 Mich. 1. c. 383; State v. Jeffries, 210 Mo. 1. c. 309; Ex parte McLaughlin, 210 Mo. 657.]

## II.

This brings us to the consideration of the most serious proposition involved in this proceeding, that is, the action of the court in declining to give an instruction for manslaughter in the fourth degree, as requested by the appellant.

At the close of the testimony and before the cause was submitted to the jury learned counsel for appellant prepared an instruction upon manslaughter in

the fourth degree, presented it to the court and requested that it be given. This request was denied. In addition to this the record discloses that after the court declined to give the instruction upon manslaughter in the fourth degree as presented by the defendant, the further request was made of the court to instruct the jury properly as to manslaughter in the fourth degree, in accordance with the law in such cases provided. Upon such request being made the court ruled that upon the facts in evidence and under the law the defendant was not entitled to an instruction with regard to that degree of homicide and refused any such instruction, to which action and ruling of the court the defendant, by his counsel, duly preserved his exceptions at the time.

After a most careful consideration of this proposition and an analysis of the evidence applicable to it, as disclosed by the record, we see no escape from the conclusion that the action of the trial court in denying the request for an instruction for manslaughter in the fourth degree constitutes reversible error.

The rule is well settled that in the trial of cases of this character the trial court, in declaring the law upon the grades of crime to which the testimony is applicable, is not warranted in confining such declaration in the submission of the grades of the offense to the case as made out by the State. If there is substantial testimony offered by the defendant, even though it only consist of the testimony of the defendant himself, which shows a state of facts which would reduce the grade of the offense, it is clearly the duty of the court to submit the issue upon that grade of crime to the jury. It makes no difference as to whether the facts as testified to by the witnesses for the defendant are true or false—so far as the application of this rule is concerned, the truthfulness or falsity of the testimony as given by the witnesses is a question for the jury. If testimony is introduced be-

fore the court and jury sufficient to reduce the grade
of the crime charged, then we repeat that it is clearly
the duty of the court to submit that issue to the
jury upon such reduced grade of the offense.

In the discussion of this proposition it is not our
province to determine whether or not the facts as tes-
tified to by the witness for the defendant were true or
false, but we simply refer to the testimony as intro-
duced by the defendant for the purpose of indicating
clearly that the evidence manifestly was sufficient to
warrant the court in submitting the issue to the jury
as to the lower grade of the offense, that is to say,
manslaughter in the fourth degree. The record dis-
closes that seven or eight witnesses testified on the
part of the defendant, and the testimony of such wit-
nesses substantially tended to prove the following
state of facts which occurred at the time of the fatal
difficulty, that is to say, when the defendant was pass-
ing out of Crispin's gate he saw Mosier and addressed
him, saying, "Hello, Mosier, I want to speak to you
a moment." Mosier said, "All right,". and stopped.
Defendant asked him why he had whipped his daughter
after promising not to, and Mosier said it was none
of his damn business, and thereupon called defendant
a liar. Defendant then called Mosier a liar. Mosier
jumped up in the road, waived his hand and swore
he would cut defendant into shoe strings, as he was
the nerviest little man that ever came to Missouri.
Defendant told him if he would put down his knife he
would strip off and fight him until he was satisfied.
Mosier swore that he would not fight any damn, big
six-foot son-of-a-bitch without a knife, and started
towards defendant. As Mosier advanced on him, some
of the witnesses testified that defendant threw a rock.
Other witnesses testified that as Mosier advanced
he and the defendant picked up rocks about the same
time. The rock thrown by Mosier struck defendant
on the head and Mosier continued to rush toward

the defendant, all the time striking and cutting at him with a knife. Defendant began to run from Mosier and continued to back away. Mosier still pursued him, all the time striking and cutting at him with a knife, and at one time cut him through his ear. After defendant had retreated a distance of about fifteen steps, and when he backed up against a fence and could retreat no further, he shot Mosier just as Mosier was making a lunge at him with a knife.

Manifestly this was a showing of a difficulty between the defendant and the deceased in which the deceased, before the fatal shot was fired, inflicted upon the defendant personal violence.

The rules of law applicable to the nature and character of the provocation which must be shown in order to reduce a killing from murder to manslaughter, are well settled in this State. In State v. Bulling, 105 Mo. 204, the distinction between the degrees of passion and of the nature and character of the provocation which arouses such passion are very clearly drawn. It was there said: "The two phases or degrees of passion under our decisions referred to are: first, that passion which is produced by a *just* provocation, and, second, that passion which is produced by a *lawful* provocation. Opprobrious epithets, insulting gestures and the like are held to constitute just provocation in this State, and, where the passion or excitement of mind is produced by such provocation to the extent that it materially interferes with the judgment and reason, an act done *at once,* under its immediate influence, cannot in law be said to be done deliberately, and the actor cannot in law be said to be in a cool state of the blood. A homicide, committed under the influence of such passion, is not murder of the first, but murder of the second degree under our criminal code. This passion, thus produced, is a statutory concession of the frailty of human nature; but before it can operate to mitigate a homicide from mur-

der of the first, to murder of the second degree, the party acting under its influence must act *suddenly* and before he has time to reflect.'' In that same case is made clear the nature of the provocation which will reduce the homicide to manslaughter. The court, in further discussing that case, says, in speaking of the provocation necessary to arouse the heat of passion, which would result in reducing the crime to manslaughter: ''This court has held that 'legal,' 'lawful,' 'adequate' and 'reasonable,' when used as adjectives qualifying 'provocation,' are synonyms, and, as a general rule, with very few exceptions, it takes an assault or personal violence to constitute this provocation.''

In State v. Gordon, 191 Mo. 114, the rule as applicable to manslaughter was stated in this language: ''At common law words of reproach, howsoever grievous, were not provocation sufficient to free the party killing from the guilt of murder, nor were contemptuous or insulting actions or gestures without an assault upon the person, nor was any trespassing against lands or goods to have the effect to reduce the guilt of killing to a grade of manslaughter; the provocation must consist of a personal violence. [1 East's Pleas of the Crown, 233; 4 Blackstone Com., 201; State v. Wieners, 66 Mo. 13.] And the common law rule in this respect is firmly established in this State by a long line of decisions. [State v. Starr, 38 Mo. 271; State v. Branstetter, 65 Mo. 149; State v. Hill, 69 Mo. 451; State v. Elliott, 98 Mo. 150; State v. Gartrell, 171 Mo. l. c. 516-519.]''

From the cases herein indicated the general rule is clearly deducible that where the provocation consists of an assault or personal violence sufficient to arouse the heat of passion necessary to reduce the offense to the grade of manslaughter, the issue upon that grade of the offense should be submitted to the jury. The question as to whether or not an assault or personal violence did in fact arouse the heat of

passion necessary to reduce the offense to the grade of manslaughter, is a question to be determined by the jury from all the facts in the case, and it is the duty of the court, under such state of facts, to submit that question to the jury.

In State v. Sebastian, 215 Mo. 58, it was insisted that the court committed error in giving an instruction for manslaughter in the fourth degree. This court, in treating of that proposition, said: "The testimony of the defendant, who testified in his own behalf in this cause, clearly furnishes a basis for the giving of this instruction, and in fact the refusal of an instruction upon manslaughter in the fourth degree, under his testimony, would have constituted error. The defendant, in giving an account of this difficulty, referring to the deceased, said: 'He picked up a corn knife and struck at me. I was about ten feet from him, and he took after me, and I ran, I reckon, ten or twelve steps, and he commenced hitting me with the corn knife on the shoulder and ear. I never shot until they hit me.' We have in that testimony an assault and personal violence before the fatal shot was fired, according to the testimony of the defendant. An instruction for manslaughter in the fourth degree, based upon that testimony, is directly in harmony with the rules of law as announced in the case heretofore cited, applicable to the subject of manslaughter in the fourth degree. We have in this case a killing done by the use of a deadly weapon, that is to say, a pistol, and, according to the testimony of the defendant, such killing was not done until after the defendant had received at the hands of the deceased personal violence in the nature of a blow with a corn knife; therefore we are of the opinion that it was quite appropriate for the court to submit to the jury, upon the testimony of the defendant, the question as to whether or not the hitting of him prior to the shooting constituted a reasonable pro-

vocation, and the sufficiency of such provocation to arouse in the defendant such a heat of passion as would render the killing under its immediate influence simply manslaughter in the fourth degree.''

In State v. Weakley, 178 Mo. l. c. 423, this court had in judgment the proposition as to the propriety under the state of facts as developed in that case of the giving of an instruction for manslaughter in the fourth degree. This court, speaking through Judge Burgess, very clearly pointed out the duty of the court upon the facts as disclosed in that case. He said: ''It has been said that under our statute manslaughter in the fourth degree includes every homicide not justifiable or excusable which was manslaughter at common law, and which is not excusable or justifiable, or is not declared by statute to be manslaughter in some other degree. [State v. Edwards, 70 Mo. 480; sec. 3477, R. S. 1889; State v. Watson, 95 Mo. 411.] Therefore, 'if the party act upon sudden passion, engendered by reasonable provocation, the existence of malice will be negatived, and the killing, though intentional, will be manslaughter in the fourth degree.'. [State v. Curtis, 70 Mo. 594.] But in order to reduce the offense from murder to manslaughter, the killing must be done in a heat of passion on a reasonable provocation without malice and without premeditation, and under circumstances that will not be justifiable or excusable homicide. And the passion which will reduce homicide to the grade of manslaughter is an excited state of the mind produced by some lawful provocation, such as a blow, or an assault of any kind upon the person. [State v. Ellis, 74 Mo. 207.] It was the duty of the court to instruct the jury upon all questions of law arising in the case which were necessary for their information in giving their verdict (Sec. 2627, R. S. 1899), and as there was evidence tending to show that the deceased assaulted the defendant and struck

him over the head with a revolver just before defendant shot him, which if true was certainly reasonable provocation, as it must have tended to arouse that heat of passion which negatives malice, and whether it did so or not should have been submitted to the jury, and the court erred in failing to do so, when its attention was called to the fact that it had failed to instruct the jury upon all the law of the case under the evidence.''

To the same effect is the case of State v. Darling, 199 Mo. 169, where it was expressly ruled that the evidence disclosed by the record tending to show that the defendant was first assaulted by the deceased it was error for the court to refuse to give an instruction for manslaughter in the fourth degree, and the judgment of the trial court was reversed and remanded upon the ground of such refusal.

We see no necessity for pursuing this subject further. That the state of facts as herein indicated, as shown by the evidence by numerous witnesses on the part of the defendant, made it the duty of the trial court to give an instruction upon manslaughter in the fourth degree, there can be no question. As was said in State v. Weakley, supra, ''this evidence, if true, was certainly reasonable provocation, as it must have tended to arouse the heat of passion which negatives malice, and whether it did so or not should have been submitted to the jury, and the court erred in failing so to do.''

## III.

Appellant next insists that the court erroneously declared the law by its instruction numbered 10. This instruction was as follows:

''The court instructs the jury that if you believe from the evidence that the defendant did voluntarily engage in the difficulty with Mosier, yet he had the

right to abandon the conflict and retire therefrom, and if it be found from the evidence that he did in good faith so attempt to withdraw from said difficulty, but that Mosier pursued and pressed hard on him with knife or stone, so that it became necessary to kill the said Mosier to save the defendant from great bodily harm or from death, then the defendant had a right to defend himself and to use such force as was reasonably necessary to defend himself from death or great bodily harm, and this is true, even though the defendant was the aggressor; provided you further believe from the evidence that the defendant did not enter into the difficulty intending at the time to kill the deceased or do him some great bodily harm.''

That instruction seems to correctly declare the law in harmony with the well settled rules applicable to that subject until it reached the concluding portion. It fully informed the jury that the defendant had the right in good faith to withdraw from the difficulty, and that if they believed from the evidence that he did in fact in good faith withdraw from the difficulty, and deceased pursued him, the defendant had a right to defend himself and to use such force as was necessary to defend himself from death or great bodily harm, even though he in the first instance was the aggressor, but the concluding part of the instruction is inconsistent with the other portion of it and clearly not in harmony with the well considered adjudications by this court. After properly declaring the law the court then concluded the declaration by saying: ''Provided you further believe from the evidence that the defendant did not enter into the difficulty intending at the time to kill the deceased or do him some great bodily harm.''

In State v. Cable, 117 Mo. 1. c. 385, the correct rule applicable to this subject was very clearly announced by this court, speaking through Judge BURGESS. It was there said: ''It is a well-established

rule of criminal law, that, although a person may voluntarily enter into, and engage in, a difficulty, he may abandon the conflict, and if he does so in good faith and is pursued by his antagonist, he may, when hard pressed, although in the first place the aggressor, if it becomes necessary to take life in order to save his own, he will be justifiable in doing so. If defendant had, in good faith, withdrawn from, and abandoned, the controversy, and deceased pursued him, then defendant was not deprived of the right of self-defense, because of having first brought on or voluntarily entered into it.''

In State v. Partlow, 90 Mo. l. c. 627, this court, in treating of this subject, did so in this language: ''Though a man should be in the wrong in the first instance, yet 'a space for repentance is always open, and where a combatant in good faith withdraws as far as he can, really intending to abandon the conflict,' and his adversary still pursues him, then, if taking life becomes necessary to save his own, he will be justified. [1 Bishop on Criminal Law (5 Ed.), sec. 871; Horrigan & Thompson on Self Defense, 227; Foster, 276.]''

In State v. Lockett, 168 Mo. 480, after a review of the evidence as disclosed by the record, it was said: ''The evidence tends to show that defendant withdrew from the conflict in good faith, intending to abandon it, and where this is the case, his right of self-defense will *revive* upon such withdrawal being made as aforesaid, notwithstanding he began the combat with a felonious and murderous design. This point is absolutely settled by authority. [State v. Partlow, 90 Mo. l. c. 627, 628, and authorities cited; State v. Cable, 117 Mo. l. c. 385.]''

In support of the correctness of the instruction now being considered the learned Attorney-General directs our attention to the case of State v. Gordon, 191 Mo. l. c. 124. It was there said: ''If he pro-

voked the combat, or produced the occasion in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder in the first degree, no matter to what extremity he may have been reduced in the combat. If, on the other hand, he had no felonious intent, intending merely an ordinary battery, and during the progress of the fight is compelled to take the life of his adversary in order to save his own, he is guilty of manslaughter; or if, having entered into a fight without felonious intent, he seeks in good faith to abandon it and withdraws as far as he can, and his adversary still pursues him, then if necessary to save his own life he slay his opponent, he will be justified.''

It is clear that this court, in the discussion of the proposition involved, simply had in view the particular facts as disclosed by the record in that case. There was testimony on the part of the State indicating that the defendant commenced the difficulty by an ordinary battery, and the language used by this court, wherein it was said, ''Having entered into a fight without felonious intent, he seeks in good faith to abandon it and withdraws as far as he can, and his adversary still pursues him, then if necessary to save his own life he slay his opponent, he will be justified,'' manifestly was not for the purpose of announcing the rule that there could not in good faith be an abandonment of a difficulty where it was entered into with a felonious intent. Obviously the court in the Gordon case was announcing the rule of law as applicable to the particular facts developed in that case, and did not intend to overrule the well-settled rule, which has been repeatedly announced by this court, that there can be an abandonment and withdrawal from a difficulty in good faith, whether it was entered into with a felonious intent to do some great bodily harm or not.

It is only necessary to suggest as to this proposition that upon a retrial of the case it should not be overlooked, in order to warrant the giving of the instruction now ·under consideration, that it is essential that there should be some substantial testimony tending to show that the defendant, after the commencement of the difficulty, in good faith sought to withdraw from it, and unless there is some substantial testimony showing that state of facts the instruction should not be given at all, but should the facts warrant the giving of the instruction now under consideration it should be so modified as to harmonize with the cases herein indicated of State v. Cable, State v. Lockett, and other cases cited.

## IV.

Numerous other complaints are assigned concerning the giving and refusing of instructions. As before indicated, this case must be retried, and it is difficult for this court to foreshadow what the testimony will be in the next trial. To undertake to discuss each and every instruction, the correctness of which is challenged, and the complaints as to the instructions refused, would obviously extend this opinion to an unreasonable length. There were too many instructions given in this case, as well as too many requested that were refused. This case is not absolutely unlike many other cases in which the charge of murder was being investigated, and it would be well for the trial court upon the retrial of this cause not to be unmindful of the many approved precedents which, with very slight changes, could be made applicable to the facts developed upon the trial of this case.

(a) Appellant complains of the refusal of instruction "D." This instruction undertook substantially to inform the jury that the defendant had a right to go upon the public road and invite a conversation

with Mosier, and ask as a parent and school patron the reason for his conduct toward defendant's daughter, and if he did so, and thereupon Mosier displayed a·knife and threatened to cut defendant, and defendant had good reason to believe and did believe that Mosier was about then and there to carry out such threat, the defendant had a perfect right to use all such reasonable means and force as were in his power to protect himself, and such act of defendant, in beginning the conversation under such circumstances, could not be said to be the beginning of a difficulty that would cut off or abridge the right of defendant to defend himself against such violence, etc.

In our opinion this instruction was properly refused. It was nothing more nor less than selecting certain isolated facts and undertaking to comment upon them. It savors entirely too much of an argument to the jury. The court in the instructions given had fully informed the jury that before the defendant's right of self-defense could be abridged it was absolutely essential for them to find that he began the quarrel or provoked the difficulty for the purpose of taking advantage of the deceased, and of taking his life or of doing him some great bodily harm. The jury had heard the testimony concerning the defendant's conduct in going upon the public road and the conversation between him and Mosier, and manifestly if the jury believed defendant merely went upon the public road and in good faith asked the deceased the reason for his conduct toward his daughter, and the deceased thereupon displayed a knife and threatened to cut defendant, and acted in such a manner as to justify apprehension of immediate danger, they would not find that the defendant either commenced the quarrel or provoked the difficulty. This court has uniformly and repeatedly condemned instructions which undertook to treat of isolated facts which may be developed upon the trial.

(b) What has been said as heretofore indicated respecting instruction "D" is equally applicable to instructions E and J. Upon the trial defendant introduced testimony tending to prove that he had previously been threatened with great violence to his person. This testimony was doubtless introduced for the purpose of explaining to the jury why he had upon his person a pistol at the time of this difficulty. This testimony was admissible as explanatory of the possession of such pistol. Upon this state of facts appellant requested the court to give instruction E, which recited that the defendant had the right under the Constitution and laws of this State to bear arms in the necessary defense of his person, and if the jury believed that he had previously been threatened with death or great bodily harm, and had good reason to believe it necessary to carry a pistol in defense of his person, then under the law he had the right to carry and use it in the necessary defense of his person, and that he should not suffer any prejudice in this cause on account of carrying a pistol. The court's action in declining to give that instruction was entirely proper. The defendant was not upon trial for carrying a concealed weapon, and while in the progress of the trial he had the right to explain why he had a weapon, yet manifestly it will not be seriously contended that a jury would undertake to abridge or in any way lessen the defendant's right of self-defense if the facts and circumstances warranted the exercise of such a right, from the mere fact that he had in his possession a pistol.

The proposition involved in this instruction was in judgment before this court in State v. Renfrow, 111 Mo. 589. That was a case of murder, where the defendant was charged with killing an officer. In that case, as in the case at bar, defendant undertook to

excuse and justify himself for carrying a pistol and drawing it on the occasion, on the ground of a feud existing between certain parties, and that threats of violence had been made against him, and that he had reason to believe that such threats would be carried into execution. Instructions were requested similar to the one now under discussion, asserting the proposition that, under such circumstances as were shown by the evidence, the defendant had the right to arm himself and carry a pistol on the day of the homicide. It was expressly ruled in that case that these facts may have availed the defendant as a defense in a prosecution for carrying concealed weapons had he been arrested and tried for that offense, but as applicable to that case it furnishes no excuse or justification for the unlawful use of such pistol in the perpetration of the homicidal act, and that the instructions were properly refused. So it may be said in the case at bar. Obviously the fact as to whether he was in the possession of a pistol and had a right to carry it, or was carrying it unlawfully, has no tendency to prove or disprove any of the issues submitted to the jury. The overshadowing question, so far as this proposition is concerned, is as to the use made of such pistol at the time of the difficulty, that is to say, whether or not the defendant, without any just or lawful provocation, killed the deceased by the use of such pistol, or on the other hand whether or not he used it upon a reasonable apprehension of danger and for the purpose of protecting his own life, or used it in a sudden heat of passion aroused by some just or lawful provocation, and not strictly upon the ground of self-defense, as defined in the instructions in this cause.

(c) Instruction "J," requested by the appellant, which was refused, substantially declared that the defendant as a patron, having a child at the school taught by Mosier, had a right to inquire into the difficulty between the teacher and his child, and to bring

it to the attention of the governing directors for their action under the law, and to seek to have the punishment of the child deferred and controlled by the directors charged by law with the control of the school, and if the jury believed he did so in a peaceable manner, he must be regarded as acting so far within his rights without prejudice to his defense in this case. That instruction was properly refused, and it is unnecessary to repeat what was said as to the refusal of instructions D and E, but it is sufficient to say that the rule as to those two instructions is equally applicable to this one. This instruction is more in the nature of an argument presented to the jury than it is a declaration of law, declaring legal principles which are applicable to a certain state of facts.

## V.

This brings us to the consideration of the errors complained of respecting the action of the court in excluding certain evidence offered by the defendant. Witnesses Terry and Williams were introduced by the State and testified to a certain character of threats made by the defendant about the time the defendant was leaving the Miller sale to go in the direction of the schoolhouse. The defendant offered testimony as to the conversation occurring at the fire after the defendant had left, between these two witnesses and others, by which it was sought to prove in these conversations that these two witnesses who had testified for the State had used the words themselves which they had sworn to as being used by the defendant against the deceased. This testimony was clearly inadmissible. If the testimony offered by the defendant sought to impeach them, or to contradict any statements they had made respecting threats by the defendant against the deceased, then it was essential that the attention of these witnesses while on the stand

be directed to the particular conversations, by which it was sought to impeach them. This was not done; but to introduce witnesses to show a conversation between these witnesses and other parties there at the fire, was simply hearsay, and in the form as offered could not be made the basis of a contradiction or impeachment of these witnesses.

It is next insisted that the court committed error in the exclusion of a note which had been left at the gate of the defendant sometime prior to this fatal difficulty. This evidence, doubtless, was offered for the purpose of showing threats against the defendant, as explanatory of his reason for having the pistol in his possession. This note was in the following form:

"Mr. ————:

"You are hereby notified that you must pay to Wm. Oeff the entire cost of that suit in fifteen days after this notice is posted, and fifty dollars for that hog that you did not buy or pay for, . . . or we'll call on you and settle with you in our way we settle with such men as you; you may find our way a hard one, remember how we settled with Grubb.

"SUGAR CREEK and ELKHORN REGULATORS."

This testimony was properly excluded. While it was entirely proper for the defendant to testify that he was threatened with personal violence and to introduce any other witnesses who could testify to threats made against him, which were afterwards communicated to him, as explanatory of his act in carrying a weapon, but this does not mean that all the details of what the threats were, and how they were made, should be detailed in evidence. To have permitted this note in evidence, or have permitted other witnesses to testify in detail as to what the threats were, and all the particulars surrounding the making of them, would

have injected into this trial an issue entirely collateral to the issue upon trial before the jury. The defendant had the right to testify generally that he had been threatened and might go to the extent of showing by whom, but the details of such threats could serve no useful purpose, and were clearly inadmissible. If on the other hand every minute detail as to the threats made against this defendant were admitted in evidence, then obviously the State would have a right to frame an issue as to the truth of those details and the time of the court would have been unnecessarily occupied in hearing testimony upon an issue that was entirely collateral to the issue to be tried by the jury. For the purposes of the explanation sought by the defendant as reason for carrying the pistol, it was only essential that he show in a general way that threats had been made against him, and for that reason he had carried it, and the court very properly excluded all testimony which sought to give in a detailed way the nature and character of such threats. But aside from all this, it was not a disputed question that the defendant's life had been threatened prior to this fatal difficulty. The record before us discloses that the State's counsel admitted that they were not seeking to contradict the testimony of defendant that his life had been threatened and that he had a right to carry a pistol. Upon this state of the record the exclusion of the testimony of which appellant is complaining, did not by any means prejudice the rights of the defendant to a fair and impartial trial.

## VI.

It is next insisted that the prosecuting officer in his argument to the jury made use of improper remarks, of such a character as prejudiced the rights of the defendant in his trial before the jury, and that this improper conduct upon the part of the prosecuting officer constitutes reversible error. It is sufficient

to say upon this proposition that upon the retrial of the cause counsel representing the State should not be unmindful of the repeated admonitions by this court that they should keep within the record.

## VII.

As herein indicated numerous other complaints are suggested in the brief by counsel. We shall not further extend this opinion in the discussion of them. It is sufficient to say that the rules of evidence, as well as the rules of law applicable to such evidence, are well settled in this State, and we shall be content with indulging the presumption that the learned trial judge, in the retrial of this cause, will not be unmindful of the settled rules of law as well as evidence applicable to cases of this nature and character.

We have given expression to our views upon the controlling legal propositions disclosed by this record. For the reasons indicated, the judgment of the trial court should be reversed and the cause remanded for a new trial. It is so ordered.

All concur.