STATE OF MISSOURI, Respondent, v. DELMAR MAYBERRY, Appellant,
No. 41579—226 S. W. (2d) 725.

Division One, February 13, 1950.

Robert A. McIlrath for appellant.

36

*J. E. Taylor*, Attorney General, and *Robert L. Hyder*, Assistant Attorney General, for respondent.

VAN OSDOL, C.—Defendant, Delmar Mayberry, killed Charles Talley with a knife. Defendant was charged with murder in the first degree. A jury found him guilty of murder in the second degree, and assessed his punishment at 55 years imprisonment in the State penitentiary. He has perfected an appeal from the ensuing sentence and judgment.

Defendant-appellant assigns errors of the trial court (1) in refusing to give Instruction A tendered by defendant upon his theory of self-defense, and in giving in lieu thereof the trial court's own Instruction C; (2) in admitting into evidence impeaching statements of defendant's wife; and (3) in permitting prejudicial argument by State's counsel to the jury.

While the evidence introduced by the State was substantial and sufficient to sustain the conviction of defendant, he had interposed the defense of self-defense on the theory he had in good faith withdrawn from the encounter but was thereafter closely pressed and had killed to avoid his own destruction. In order to closely examine his assignment (1) of error in the refusal and the giving of instructions, we will review the evidence tending to support his theory of defense.

The homicide occurred about ten o'clock the evening of May 23, 1948, in Frankclay, St. Francois County, at the home of Guy Gillam and wife Pauline. Defendant's wife, Gretchen, was formerly the wife of deceased, Charles Talley. Gretchen and Talley were the parents of Pauline Gillam; and of Virginia Mayberry, the wife of defendant's brother, Clarence Eugene Mayberry. Gretchen and Talley were divorced in 1939. Defendant and Gretchen were married in 1943, and for about a year preceding the tragedy had lived in St. Louis. However, on May 22d, Gretchen had come to Frankclay and, the evening of May 23d, was present in the home of her daughter Pauline Gillam. The deceased, Charles Talley, was then living at the home of the daughter Pauline.

As stated, defendant and his wife were living in St. Louis and the day preceding the homicide Gretchen had come to Frankclay. She came to attend her daughters, both of whom were pregnant and were soon to be confined. Upon visiting Frankclay, Gretchen usually stayed at the home of her daughter, Virginia Mayberry, but May 23d Pauline Gillam was ill; and Gretchen was at the Gillam home, as stated. About 9:30 o'clock that evening defendant came from St. Louis to Frankclay, knocked at the door of the Mayberry home and inquired of the whereabouts of his wife. Upon being told she was at

Pauline's, defendant said, ''I think I will go up there a few minutes and be right back.''

The home of Guy and Pauline Gillam fronts southwardly upon a street in Frankclay. The house is about 20′ x 22′, and has four rooms. A door in the south side of the house opens into the living room, the southeast (front) room. This room is also used, when needed, as a sleeping room. Defendant's wife, deceased's former wife, was occupying this room the evening of May 23d. A door opens off the north (back) porch into the kitchen, the northeast room. The room west of the kitchen is a bedroom, the northwest room. May 23d, a bed in the northwest bedroom was occupied by the deceased, Charles Talley, and by the small son of Guy and Pauline Gillam. The southwest (front) room is a bedroom and, the night of May 23d, was occupied by Guy Gillam and wife Pauline. Archways and doors permit one to ''circle'' ▪ around from room to room through the four rooms of the house.

There was evidence tending to show defendant, having learned his wife was at the home of her daughter Pauline, went to the Gillam home; opened the front door; went in; struck a match; located the light; turned on the light; talked to his wife; and, glancing northwestwardly, observed Charles Talley lying in bed in a northwest bedroom. Charles Talley, 43 or 44 years old, weighed close to 200 pounds. We infer defendant is a rather small man. He is about 37 years of age.

Defendant walked on into the kitchen. He turned on the kitchen light. ''I was going to tell him (deceased) to stay away from my wife.'' Deceased told defendant not to come in, to get out of there or he would kill defendant. Deceased jumped out of bed and grabbed something. At the time, defendant had his knife in his hand. The small blade was open. He rushed in and shoved deceased back onto the bed. Defendant's wife grabbed defendant by the arm and pulled him off deceased. Deceased threw something at defendant. ''It hit me and cut my arm.'' Deceased grappled with defendant and they fell back on the bed, fighting. Deceased threw a comforter around defendant's head. Defendant's knife ''hung up'' in the comforter, ''closed up'' and cut his hand.

Defendant put his knife back into his pocket. He tried to get the comforter off his head. He ran back through the room and started out the front door, but ''Mr. Gillam was running out,'' and defendant could not get out. Defendant ran the ''complete circle of the house.'' He ran to the kitchen door, found it locked, ''couldn't get out there, and turned around and looked. Here he (deceased) was coming after me in the kitchen. I was running around the table, and he hit me, and I almost fell over the table, and he come into me and clinched me again . . . and went to choking me.'' Defendant again

took his knife out of his pocket, "that time I had the big blade open . . . I knew he was going to hurt me . . . He hit me such a hard lick . . . and then is when I started cutting."

Deceased, having been wounded ten times with four wounds penetrating the body cavity and one through to the heart, fell dead with his body on the kitchen floor, his lower legs extending into the living room. Defendant walked out of the house.

While there was sufficient evidence introduced by the State to sustain the view defendant was the aggressor and with felonious intent, we have set forth defendant's testimony tending to show defendant in good faith sought to withdraw from the encounter and effected the mortal wound or wounds only when he was thereafter sorely pressed.

There is a difference between "withdrawal in good faith" from combat, and a mere "retreat" which may be and often is a continuance of hostilities. A "withdrawal" is an abandonment of the struggle by one of the parties and such an abandonment must be perceived by the other. State v. Heath, 237 Mo. 255, 141 S. W. 26. Now, in the instant case, defendant testified that, after the initial encounter in the northwest room, he put his knife back into his pocket and, being pursued by deceased, ran around through the four rooms, vainly attempting to get out of the house, first by way of the front door, then through the kitchen door. He took out his knife, opened the big blade and cut deceased when, finally unable to escape through the kitchen door, he had been grappled with, hit and choked by deceased. Considering his testimony as true, defendant in good faith sought to withdraw, and abandon combat; and, it could be reasonably inferred, in the circumstances stated by defendant, his movements in his attempted withdrawal in the lighted rooms were evident to deceased. Compare State v. Gadwood, 342 Mo. 466, 116 S. W. 2d 42.

The trial court gave Instruction No. 6, instructing with respect to self-defense generally; however, defendant, seeking the submission of his theory of self-defense, tendered Instruction A. The Instruction A is as follows,

"The Court instructs the jury that even though you find and believe from the evidence that Delmar Mayberry attacked the deceased, Charley Talley, in the bed room and if you further find and believe that before he had inflicted any fatal wound he ceased fighting and made an effort to escape through the back door, if you so find, and if you further find and believe from the evidence that the deceased, Charley Talley, attacked the defendant while he was making an effort to escape and if you further find the defendant had reasonable cause to believe and did believe that the deceased, Charley Talley, was about, then and there, to take the defendant's life or to do him some great bodily harm and that the danger of his doing so was then

and there imminent and impending, then so finding your verdict shall be for the defendant.''

The trial court refused the Instruction A, but on its own motion the trial court gave Instructon C, which is as follows,

''The Court instructs the jury that even though you find and believe from the evidence that the defendant, Delmar Mayberry, *without a felonious intent*, did enter into a difficulty with the deceased, still, if you believe from the evidence that after said difficulty had commenced, the defendant attempted in good faith to withdraw from the difficulty, but was prevented from doing so by the deceased, Charles Talley, if you so find, then in that event the defendant would be excused in taking the life of said Charles Talley if it became necessary for him, the said Delmar Mayberry, to save his own life under the theory of self-defense as hereinbefore explained to you in Instruction No. 6.'' (Our italics.)

Now the italicized phrase of the Instruction C narrowed the effect of the instruction so that the jury may well have thought defendant's right of self-defense was lost to him and was not revived if the jury believed defendant entered into the difficulty *with* felonious intent although the jury may have also believed defendant's testimony tending to show he had nevertheless repented and had attempted in good faith to withdraw. Where, as in the case at bar, the evidence tends to show a defendant withdraws from a conflict in good faith, intending to abandon it, ''his right of self-defense will *revive* upon such withdrawal being made as aforesaid, notwithstanding he began the combat with a felonious and murderous design.'' State v. Lockett, 168 Mo. 480, 68 S. W. 563. In our opinion the instruction was prejudicially erroneous. State v. Heath, 221 Mo. 565, 121 S. W. 149; State v. Lockett, supra; State v. Cable, 117 Mo. 380, 22 S. W. 953; State v. Partlow, 90 Mo. 608. And see State v. Williams, 337 Mo. 884, 87 S. W. 2d 175; and see again State v. Gadwood, supra.

It is contended by the State that the evidence favorable to defendant tends to show he went into the difficulty *without* felonious intent. It is urged that under his ''own version'' defendant had no felonious intent and the Instruction A was not prejudicial. This argument fails to take into account the State's evidence (which the jury must have believed inasmuch as the jury found defendant guilty of murder) tending to show, as stated, defendant entered into the encounter *with* felonious intent. We bear in mind that, if defendant in good faith sought to withdraw from the encounter but was thereafter sorely pressed and was obliged to take deceased's life, the killing was justified although the defendant was initially the aggressor and *with* or *without* felonious intent. State v. Heath, supra, 221 Mo. 565, 121 S. W. 149.

We are treating here with a theory of self-defense justifying homicide. This theory must be distinguished from the theory of imperfect self-defense in which a defendant is the aggressor but enters into a difficulty *without* felonious intent during which encounter defendant is obliged to kill to save his own life. Shown facts supporting the latter theory do not justify the homicide, but reduce the grade of the offense. State v. Cable, supra; State v. Parker, 106 Mo. 217, 17 S. W. 180. Such latter theory contemplates a continuous encounter, and not a factual situation of "withdrawal in good faith." The distinction between the two theories of self-defense is made clear in State v. Cable, supra, 117 Mo. at pages 385-386, 22 S. W. at page 954; State v. Parker, supra; and State v. Partlow, supra. See also State v. Graves, 352 Mo. 1102, 182 S. W. 2d 46; State v. Williams, ▆▆ supra; State v. Moncado, Mo. Sup.; 34 S. W. 2d 59; State v. Heath, supra, 221 Mo. 565, 121 S. W. 149.

▆ (2) The prior statements of a defendant's wife to the prosecuting attorney which are inconsistent with her testimony upon matters within the scope of her direct examination at a defendant's trial are admissible in impeachment quite as are the statements of other witnesses. See State v. Revard, 341 Mo. 170, 106 S. W. 2d 906; Section 4081 R. S. 1939, Mo. R. S. A. § 4081; and compare State v. Burnett, Mo. Sup., 206 S. W. 2d 345.

▆ (3) In the argument to the jury by counsel for the State, it was stated, "We must give him (defendant) every benefit all the way through. The burden is on us. He has everything his way, and . . . ." We cannot believe the argument was prejudicial. However, counsel for the State in the closing argument urged, "Whose home was broken up? Who was married to her (defendant's wife) for many years? And who was living with her up to the time the dead man went to fight for his country?" Since the argument of counsel for defendant is not contained in the transcript, we are not able to determine if the argument of counsel for the State was in answer to that of defendant's counsel. The argument of State's counsel cast the insinuation defendant had invaded deceased's home while deceased was in the service of his country. It would seem the argument was improper. It was such as would tend to arouse the jurors' feelings against defendant and was not justified by any evidence introduced. We believe the argument should not be permitted upon retrial.

The judgment should be reversed and the cause remanded.

It is so ordered. *Lozier* and *Aschemeyer, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.