STATE of Iowa, Appellee,

v.

Dennis Eugene FISHER, Appellant.

No. 58822.

Supreme Court of Iowa.

Nov. 17, 1976.

Jenk, Jenk & Goen, Dyersville, for appellant.

Richard C. Turner, Atty. Gen., Jim P. Robbins, Asst. Atty. Gen., and E. Michael Carr, Delaware County Atty., for appellee.

Heard by MOORE, C. J., and MASON, LeGRAND, UHLENHOPP and McCOR-MICK, JJ.

UHLENHOPP, Justice.

This appeal involves two rulings by the trial court in a prosecution on a murder charge under § 690.2, Code 1975.

I. The evidence abundantly supports the jury's finding of first-degree murder. Summarized, the jury could find that defendant Dennis Eugene Fisher had an intimate relationship with Myra Miller, wife of Howard Miller. Howard learned about the relationship and objected. Defendant borrowed a shotgun and a rifle, drove in his truck to the Miller farmstead, met Howard in the barnyard, shot and killed him, and subsequently buried the body in the calf shed. Defendant does not contend that the State did not make a first-degree murder case for the jury.

Defendant's testimony, however, was quite different. He testified:

I arrived at the Howard Miller's right about 7:00, maybe a little after. I pulled into the yard, and Howard was about halfway to the house, and Myra was at the door yelling something at him. And I opened the car and asked Howard—and asked what was going on; what the problem was. Now, this is where I ain't quite sure what she said. But, I thought she said that he's going to kill me or something like that. I don't know her exact words. All of a sudden she turned around and headed back into the barn, and I noticed Howard coming out of the house with a gun in his hand. Well, I seen he had the gun with him, and I asked what he was planning on, you know, what he was doing; what was going on. And well, his exact words, at that time was, "I'm going to get rid of the bitch."

Well, at that time there, I had both Les Gaul's .12 gauge and the .22 was sitting in the seat of the car, and I pulled the .22 out, because I thought possibly he would be more scared of a rifle than he would be of a shotgun, and also I knew that a rifle, the odds of doing any damage with a rifle was very, you know, very dim.

I was standing beside the truck. I just had to reach inside the truck and pull the gun out. He was headed down toward the barn. I started walking toward him. "Howard, you don't know what you are doing. Things can't be near as bad as what you are making out or going on." And he just said, "You don't know what the hell she has done." Well, then I more or less told him that I wasn't going to let him—continue to let him do anything like he had in mind. And all of a sudden, he just said, "You're just as bad as Kelly and my dad," and he pulled up—well, looked like he was going to pull up the gun on me. I dove to the right, and about the time that I dove to the right I heard his shotgun go off. At that time there I come to a—kind of like a—you might say a kneeling position, and I asked—well, I looked at him and he just tripped the gun and kicked one shell out. He started walking toward me and said he was going to get me. I really don't remember what I said then. But then, I don't know

whether he reached in his coat pocket or pants pocket or what it was, but it seemed like he was going for a shell. And I told him, "Don't load that gun again. If you load it, I'll drop him." He dropped a shell into the chamber. He didn't close it up, he just kept walking toward me. If he said anything, I don't remember what it was. I didn't say anything more to him after I told him if he loaded it I'd drop him. Well, then he closed the breach up on the gun and started to bring it up, and I fired at him. I fired—that time there, I fired one shot. Well, after I fired that one shot, I just— he stopped. And he just kind of looked at me kind of weird; seemed like he started to take a couple more steps toward me, and then I don't remember whether I got up or what it was. All I know is his gun went off again, and he was laying on the ground.

I don't know how many times I fired after I heard his shotgun go off a second time.

At the conclusion of the evidence the trial court submitted to counsel its final draft of instructions to be given to the jury and called for exceptions. Instruction 21 dealt with defendant's alleged defense of Myra as justification for the homicide, but made no mention of defendant's alleged defense of himself—nor did the instructions elsewhere submit to the jury the issue of self-defense. The prosecutor made two statements regarding Instruction 21. The second was this:

Furthermore, I'm a little bit fearful of the Court saying that, sua sponte, the Court should have also instructed upon possible self defense of the defendant himself. It appears to me to be a chain of causation. The initial chain was instigated by—if we were to believe this self defense, of course, which we do not accept—but, according to the defendant's statement, that initial chain reaction was started by his coming to the defense of the defendant [sic]. But, it could be that the intervening shot, as he told it, could have created such a cause as to change his defense from Myra Miller to defense

of himself. That is, the claimed shooting at him. Because of that we are a little fearful that maybe the instruction should include both the defense of Myra Miller and the defendant, and that would therefore change—in other words an Instruction 21A, or a different instruction giving self defense on the part of the defendant. And that would change 22 and 23, and I believe, 24 to make the paragraph six like in 22 read that "Such action was not done in a lawful defense of Myra Miller or the defendant, or himself." Those are the only objections we have.

Defense counsel stated:

I had that same objection that I wanted, you know, Dennis Fisher added and Myra Miller to each one of those times when the self defense is mentioned, because it's our contention that when he turned on him and said, "I'm going to shoot you, too," or something to that effect, that then it became self defense of himself. I agree with the State's suggestion. That was the first thing that popped up at me when I read these instructions, that Dennis Fisher ought to be added to that. I take exception to paragraph one of instruction 21, the same paragraph that the State's Attorney objected to. Further, I filed in at the close of the State's case several proposed instructions. One of them was a separate instruction about the burden of proof being on the State to prove beyond a reasonable doubt the self defense. It's their burden, and I don't think in total these instructions give the emphasis to that point that a separate—that my client is entitled to.

The trial court took the position, however, that defendant could have retired and avoided a confrontation but for his remaining to defend Myra; therefore defense of Myra, as stated in Instruction 21, adequately covered the matter. Hence the court gave the jury Instruction 21 and did not submit defendant's contention of defense of himself. Did the court err?

■ If the record contains substantial evidence from any source of the four elements

of self-defense, that issue must be submitted to the jury. *State v. Scovill*, 224 N.W.2d 221 (Iowa); *State v. Broten*, 176 N.W.2d 827 (Iowa); *State v. Johnson*, 211 Iowa 874, 234 N.W. 263. See *State v. Overstreet*, 243 N.W.2d 880 (Iowa) (1. slayer not aggressor, 2. retreat, 3. belief of imminent danger, and 4. reasonable grounds for such belief).

■ Defendant's testimony appears to us to constitute substantial evidence of all four elements and to require submission of self-defense. True, according to defendant's theory the reason he originally became involved and the reason he could not withdraw was the danger to Myra's life. But we think submission to the jury of defense of Myra, alone, would not be adequate for a lay jury. At the moment of the shooting, Howard had temporarily abandoned pursuit of Myra. He was directly approaching defendant. At that moment (the jury could find) defendant was defending himself. A legal mind might root the whole incident on defense of Myra, but jurors are not ordinarily legally trained. Confronted with the evidence that Howard had turned his attention and gun away from Myra and onto defendant, we think the jurors were entitled to know the law on self-defense and to have that issue submitted to them for decision.

The State argues that defendant's original aggressive posture—becoming embroiled in the confrontation voluntarily—rules out self-defense. But this argument overlooks the testimony about Howard's menacing conduct toward Myra. As to defense of another, see 40 Am.Jur.2d Homicide § 170 at 456; 40 C.J.S. Homicide § 108 at 967–969.

The State also argues that defendant could have retreated and thus avoided the final act of homicide. The rule is that the slayer "must retreat as far as is *reasonable* and safe before taking his adversary's life, except in his home or place of business . . . .." *State v. Cruse*, 228 N.W.2d 28, 30 (Iowa) (italics added). The jury could find that defendant could not reasonably retreat from the scene for fear of exposing Myra to defendant's gun.

The court erred in failing to submit self-defense.

II. At some time after the homicide, Myra and defendant went to West Plains, Missouri. Myra had a money order for $8000 payable to herself and Howard Miller, from the sale of property which had belonged to her and Howard. The sheriff of Delaware County, Iowa, knew of the money order and of Myra's general whereabouts. (Sometimes the parties refer to the money order as a check or draft.)

Someone in the Delaware County sheriff's office, or an agent of the Iowa Bureau of Criminal Investigation, notified the sheriff in West Plains of Howard's disappearance, of the presence of Myra and defendant in the West Plains vicinity, and of Myra's possession of the money order payable to Myra and Howard. Defendant questions that Iowa officers were the ones who passed this information to the West Plains sheriff, but the record clearly indicates they did.

The West Plains sheriff notified the two banks in that city to be alert for the presentation of the money order for $8000 payable to Myra and Howard Miller.

On April 23, 1975, one of the two banks notified the West Plains sheriff that Myra had approached the bank with the unendorsed money order, and that the bank had informed her Howard Miller's endorsement was necessary to negotiate the instrument.

Later that day the other bank notified the West Plains sheriff that defendant, with Myra present, had appeared at the bank to negotiate the money order, which bore the endorsements of Myra and Howard Miller. A deputy sheriff proceeded to the bank and took defendant and Myra into custody under charges, according to the sheriff's records, of forgery as to Myra and uttering a forged instrument as to defendant.

While thus in custody and after receiving the Miranda warning, defendant and Myra made statements about the homicide and

attendant details, and defendant stated where the body was buried.

■ Defendant contends that his statement in custody and all the evidence that his statement led to are inadmissible because they followed his arrest without probable cause, citing *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, and *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797. The trial court rejected defendant's contention.

Defendant is mistaken that his arrest in Missouri was unlawful. The facts and circumstances within the Missouri officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person to believe that defendant had committed or was committing the offense of uttering; hence the officers had probable cause to arrest him. *State v. Morris*, 227 N.W.2d 150 (Iowa). See also *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142; *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327.

The trial court properly rejected defendant's contention.

Defendant is entitled to another trial because of the error regarding self-defense.

REVERSED.