STATE of Iowa, Appellee,

v.

Billy Gene HUEMPHREUS, Appellant.

No. 60660.

Supreme Court of Iowa.

Oct. 18, 1978.

458

Oehler, Radig, Hoy, Muller & Richard, P. C., Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Lona J. Hansen, Asst. Atty. Gen., and Jack W. Dooley, County Atty., for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, REES, UHLENHOPP and HARRIS, JJ.

LeGRAND, Justice.

Defendant was tried on a county attorney's information charging him with murder in violation of § 690.1, The Code. The jury returned a verdict finding him guilty of the included offense of manslaughter. On his appeal, the court of appeals affirmed the judgment sentencing him to a term of not more than eight years in the penitentiary. § 690.10, The Code. We granted further review, and we now affirm the judgment.

The sole issue presented concerns the trial court's instruction on self-defense. Before considering this matter, we relate the circumstances under which the case arose.

Defendant was convicted of stabbing Henry C. Kober to death following an altercation on a public highway near Iowa City. The two men were long-time friends and business associates. After defendant and his wife were divorced, Mr. Kober began keeping company with her. There was evidence defendant objected to this relationship, although he testified he did not. In any event defendant admits he resented the improper influence he says this affair had on his young daughter. This led to several confrontations between the two men, and on at least one occasion Mr. Kober threatened defendant with physical harm for slurring remarks about his former wife. Quite understandably, the business relationship between the two men deteriorated, and they soon decided to terminate their association.

On the night of the fatal fracas, defendant, who suspected Kober was wrongfully removing some tools and equipment from the business premises, went looking for his ex-partner. He saw a truck which he thought was Kober's and we set out defendant's testimony to pick up the story from there:

\*     \*     \*     \*     \*     \*

"Q. Now [tell us] the route you took out [of the mobile park home.]

A. Well, I backed out of the driveway and came up here, went across this street, down here up past the equipment.

Q. Did you stop?

A. No, there was nobody there, went right out here and right out of the court. \* \* \* I pulled on out of the court and turned to my right and started toward Iowa City. There is a set of railroad tracks, I went across and right across the railroad tracks there is one entrance to Highway 218. Before I had gotten to that entrance I saw a pickup truck, oh, I would say maybe two to three blocks ahead of me on the access road from 218 \* \* \* and I pulled onto the highway at the closest entrance onto 218 across the railroad tracks.

Q. Was it snowing or had it recently snowed?

A. It had snowed, yes. The highway was slushy, slippery. And by this time Henry's truck—there was no longer any question—was parked, stopped at the other entrance by the Imperial gas station to turn onto Highway 218. He had sat there for a short time and let a couple of vehicles—waited for a couple vehicles to go by, and there was no one coming and I pulled right out onto the highway, didn't have to wait for any vehicles or anything, and by that time Henry's truck was moving and going up the highway, not very fast, and I started going up the highway in my truck.

\*     \*     \*     \*     \*     \*

A. \* \* \* I caught up to Henry's truck in the area close to the airport

* * * and I passed their truck and I was, like I say, they weren't going too fast. I was going somewhat faster. I don't know whether you could say considerably faster or not, and I went on past them until I could see the headlights in my rear view mirror, and pulled over into the righthand lane and I tapped my brakes a couple times to see how they were going to hold on the road, and just slowly slowed down and stopped. * * * I got out of the truck and just gave the door a slam and Henry at that time was just pulling up and stopping behind me. I immediately started to walk back past my truck.

*     *     *     *     *     *

Q. What were you looking for?

A. Well, I wanted to see if perhaps he had some of my equipment in the back of his pickup. Like I say, I had been missing stuff and I just really couldn't see any other thing that he would be doing down there at that time of night on a night like it was.

Q. Go ahead.

A. Anyway, as soon as I got out of the truck and I gave the door a swing and I started walking back alongside my truck. Henry was probably stopped eight to twelve feet behind me. It could vary. I wasn't looking to step it off, see how far it was, but I am sure there would have been room to pretty near drive another pickup sideways between us and he started to get out of the truck when I was near the back of my truck and I kept walking. I wanted to go back and look in the back of his truck and we met right on a pretty close line with his left front fender. As he walked up he pointed his finger and he said, 'Now, old Buddy, I have got you right where I want you.'

*     *     *     *     *     *

A. * * * I said, 'You sneaky bastard, why don't you stay away from me and leave me alone?' * * * And he started to push me back and he said, 'you ain't going to have to worry about it anyway,' and immediately he swung at me with his right hand, and I ducked and pulled back and he lost his balance and he lost his grip on my shirt and went down on his hands. I was off balance and kind of slipping and sliding and as soon as he started to get up he started swinging right from the ground, and he hit me in this shoulder and my feet flew out from under me. I fell right on my can on the pavement and I was kind of leaned over to one side and he was standing right there kind of—He had I believe his left foot was kind of on the heel of my boot and when I fell I put my hand out and I can't say for sure whether I felt the knife in the pocket of my coat or laying on the ground. Maybe it had fallen out, but I got up and picked up the knife and held it out in front of me and he kept swinging at me with either hand, and I was doing the best I could to duck and trying to back up and get out of range, and finally he hit me with his right hand right in this area of my ear (indicating) and by this time I was back far enough that when—it knocked me down, when I fell my butt was on the curb and I—

Q. He knocked you to the ground?

A. Yes.

Q. Go ahead.

A. I had one leg in front of me and one was kind of doubled up under me and I could kind of see his feet come forward and I put my hand up over my head and I still had the knife out in front of me and all at once I felt weight on my arm and shoulder and on the other side of my face, and I can't honestly say whether he was throwing his weight on me or whether he had slipped and was

falling. I doubt that he was throwing his weight on me because I don't believe I could have held him up, and I think that he slipped and as his weight came down on me I heard him inhale (indicating), and as far as I know that is when he got the wound in his chest. I at no time tried to go at him with the knife or try to stab him in any way. I was trying to keep away from him and keep him away from me. When I started to get up I saw blood on the snow on the pavement. I was kind of dazed, when I finally got up he was back up over by where we had originally met by the front left fender of his truck and he was standing kind of bent forward with his arms out away from his sides and I got up and I put one hand on the back of my pickup and he turned around and slowly walked over to the door of his truck and he stood there for, I have no idea, just a very short time, and he started like he was crouching down. I thought maybe he was going to get his rifle out from under the seat and shoot me, and I went around my pickup, got in, started it and started to turn around, and when I started to turn around I looked back and he was completely down on the ground on his back and Tess was hollering, 'He's really been hurt. We have to get help,' and I continued to turn around. * * * I got out of the truck, went back across and kind of bent over and I could see at that time that the front of his insulated jacket had blood all over it.

 *      *      *      *      *      *

Q. I hate to take you through some of these things again, Bill, but I do want to ask a few questions about this incident itself. Did you know that Henry carried a gun?

A. Yes, I was sure that he would have one in the truck at that time. It was during hunting season and both he and I were in the habit of—a strong habit of carrying a rifle under the seat of our truck.

Q. Did you also have your rifle in your truck?

A. Yes, it was.

Q. Was it still loaded?

A. Yes, it had been there ever since I got out to shoot at this rabbit which I ultimately didn't end up shooting at.

 *      *      *      *      *      *

Q. Tell us about your feeling from the time you first got out of the truck.

A. Well, the time I got out of the truck I wasn't thinking about fighting or anything like that. I just wanted to go back and see if there was any of my equipment in the back of his truck, and when he said—probably the first sentence he said to me, it was very apparent to me that he was drunk, and I had seen him in that condition many, many times. After he started swinging at me he missed with the first swing, got right back up and hit me.

Q. Was it a hard punch?

A. I knew I was in trouble.

Q. Was it a hard punch?

A. Well, I think three or four days before I could lift my arm above shoulder height.

Q. Did you go right down?

A. Yes, my feet went completely out from under me.

Q. What were you thinking at this time?

A. Well, I was scared. After I found out to my own satisfaction that he was drunk I knew in my own mind he was drunk and he certainly didn't show any intention of being satisfied with swinging at me and missing or hitting me and knocking me down, because he was standing right there ready to do it again. There wasn't any time to turn around and run or anything but try

and keep him away from me, and that was the main thought I had when I pulled the knife out of my pocket or picked it up off the ground or wherever it was when I put my hand on it.

Q. What were your thoughts about him?

A. Well, I was sure he was drunk and after he wasn't satisfied with swinging and missing once and then knocking me down, I didn't know what was going to happen. I was doing the best I could to get away from him and keep him away from me. When somebody is walking towards you swinging with both hands, you don't have time to do anything but try and get out of the way.

\* \* \* \* \* \*

Q. Did you at any time make any motion with your hand when you had the knife in it?

A. Only to waive it back and forth in front of me to try and keep him back away from me at a distance.

Q. Did you hear anybody?

A. Yes, when I first got up with the knife my ex-wife was—must have been out of the truck and she was somewhere behind me and she said, 'Stay away from him, Henry. He's got a knife. He's crazy,' and also she was saying something about, 'Stay away from him' when I was down on the ground with my hand over my head, but I couldn't really hear. I had my hand over my head and my ear and I was kind of dazed from being hit."

\* \* \* \* \* \*

The trial court instructed on the issue of self-defense in Instructions 16, 17, 18, 19, 20, 21, and 22. Defendant objects only to Instruction 22 dealing with the circumstances under which an aggressor may revive his right of self-defense. We set that instruction out in full:

"One who is the aggressor and brings on a conflict and presses the combat, cannot claim the benefit of the law of self-defense to shield him from the consequences of having slain his adversary. It is only one acting on the defensive who can claim that right.

If you find from evidence beyond a reasonable doubt that the defendant was the aggressor at the time in question and made the first show of force, and thus brought on the conflict and pressed the fight until Henry C. Kober was slain then defendant cannot claim to have acted in self-defense.

If you find that the defendant was the aggressor but that he did, in good faith, withdraw from the fight and signify to the deceased that he had so withdrawn and abandoned further combat, and if you further find that the deceased had reasonable grounds for believing that the defendant had so withdrawn and abandoned further combat, and if you further find that the deceased after said withdrawal of the defendant continued the combat and advanced upon defendant in a threatening attitude and with threatening words, then and in that event the defendant thereafter would have the right of self-defense as explained to you in these instructions."

■ Defendant's principal complaint is that the instruction fails to allow him the benefit of an *attempted*, as well as actual, withdrawal from hostilities. We find no merit in his position. Without foreclosing the possibility that such a distinction might be important under some circumstances, it has no validity here.

■ Despite defendant's vigorous arguments to the contrary, the gist of either withdrawal or attempted withdrawal is notice to one's adversary. This may consist of either conduct or words sufficient to furnish reasonable grounds for the adversary to recognize an intention to call off hostilities.

■ One against whom a flight has been provoked cannot know he is no longer in

danger from a mere subjective decision on the part of his attacker. To put it another way, there can be no withdrawal or attempted withdrawal unless the other party knows about it.

This is the general rule to which we have been shown no exception.

The following appears in 40 C.J.S. *Homicide* § 121 (1944):

"In order that the right of self-defense may be restored to a person who has provoked or commenced a combat, he must attempt in good faith to withdraw from the combat. He must also in some manner make known his intention to his adversary; and if the circumstances are such that he cannot notify his adversary * * * it is the assailant's fault and he must bear the consequences. As long as a person keeps his gun in his hand prepared to shoot, the person opposing him is not expected or required to accept any act or statement as indicative of an intent to discontinue the assault."

■■■ The rule is stated as follows in 40 Am.Jur.2d *Homicide* § 150 (1968):

"Even though the accused may in the first instance have intentionally brought on the difficulty and provoked the occasion, yet his right of self-defense will revive, and his actions will be held justifiable upon the ground of self-defense, in all cases where he has withdrawn from the affray or difficulty in good faith as far as he possibly can, and clearly and fairly announced his desire for peace. In such cases, if he is pursued by the other party, who again brings on the difficulty, his right of self-defense, though once lost, revives, and may be successfully pleaded by him. * * * However, this may be, the courts are generally agreed that an aggressor, to be remitted to this right, must have withdrawn actually and really and in good faith. He must retreat as far as the fierceness of the assault by the other will permit without danger of death or great personal injury, before he will be justified in killing. An insufficient retreat is of no effect. Nor is this all; the aggressor must inform his antagonist of

his purpose to withdraw from the conflict. If the circumstances are such that he cannot do this, it is attributable to his own fault and he must abide by the consequences."

What defendant would really like to have is the same right of self-defense that a nonaggressor would have; but this can't be. The aggressor, if he is to reclaim the defense, must first rid himself of that onus. All authorities agree this can be accomplished only after the victim has notice that the fight is over. *See United States v. Peterson*, 157 U.S.App.D.C. 219, 228, 483 F.2d 1222, 1231 (1973), *cert. denied* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244; *State v. Brown*, 313 So.2d 581, 584 (La.1975); *State v. Haakenson*, 213 N.W.2d 394, 400 (N.D. 1973); *State v. Craig*, 82 Wash.2d 777, 514 P.2d 151, 156 (1973); *State v. Graham*, 292 Minn. 308, 195 N.W.2d 442, 444 (1972); *People v. Moore*, 43 Cal.2d 517, 275 P.2d 485, 490 (1954); *State v. Mayberry*, 360 Mo. 35, 226 S.W.2d 725, 727 (1950); *State v. Broadhurst*, 184 Or. 178, 196 P.2d 407, 431 (1948), *cert. denied* 337 U.S. 906, 69 S.Ct. 1046, 93 L.Ed. 1718; Annot. 55 A.L.R.3d 1000, 1003–04 (1974).

We have set out defendant's testimony on self-defense. There is not a scintilla of evidence that he did anything to quit the fray. There is only his testimony about his secret decision to do so. Even that is equivocal. He said only that he wanted to "keep away from Kober" and there was no time to "turn and run." Under the record it appears he stayed and fought.

How was Kober supposed to take defendant's actions? Here was an opponent who had sought him out and provoked the fight. There was a history of past difficulty between them including past physical confrontations. At no time did defendant renounce the battle. In fact during the encounter—when he was supposed to have lost his taste for the fray—he armed himself with a knife, a weapon he did not originally display. Although defendant attempts to argue that he tried to retreat but couldn't because of the ice and snow, his testimony belies this. Not once did he give

this as a reason for his inability to stop the fight. Defendant neither said nor did anything furnishing reasonable grounds for notice to Kober that the danger was past and combat was ended.

We doubt defendant was entitled to a withdrawal-from-combat instruction at all. Certainly the one given was as favorable as he could reasonably hope for. While the state must prove beyond a reasonable doubt that defendant did not act in self-defense, still the issue must be submitted on the evidence in the record and not on some imaginary and unsupported theory.

We have reviewed two of our own opinions upon which defendant relies heavily and which he says entitle him to a new trial because of reversible error in Instruction 22. *State v. Fisher*, 246 N.W.2d 918, 920–21 (Iowa 1976) and *State v. Whitnah*, 129 Iowa 211, 214, 105 N.W. 432, 433 (1905). Those cases do not lend support to defendant under the record before us.

The judgment is affirmed.

AFFIRMED.